WIL-FRED'S INC., Plaintiff-Appellee, *v.* THE METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Defendant-Appellant.

First District (2nd Division)    No. 76-481

Opinion filed January 17, 1978.

Allen S. Lavin, of Chicago (James W. Kennedy, Alan J. Cook, and Ina S. Winston, of counsel), for appellant.

James E. O'Halloran, Jr., D. Daniel Barr, and Thomas C. Walker, all of Chicago (Bell, Boyd, Lloyd, Haddad & Burns, of counsel), for appellee.

Mr. JUSTICE PERLIN delivered the opinion of the court:

In response to an advertisement published by the Metropolitan Sanitary District of Greater Chicago (hereinafter Sanitary District) inviting bids for rehabilitation work at one of its water reclamation plants, Wil-Fred's Inc. submitted a sealed bid and, as a security deposit to insure its performance, a $100,000 certified check. After the bids were opened, Wil-Fred's, the low bidder, attempted to withdraw. The Sanitary District rejected the request and stated that the contract would be awarded to Wil-Fred's in due course. Prior to this award, Wil-Fred's filed a complaint for preliminary injunction and rescission. After hearing testimony and the arguments of counsel, the trial court granted rescission and ordered the Sanitary District to return the $100,000 bid deposit to Wil-Fred's. The Sanitary District seeks to reverse this judgment order.

The Sanitary District's advertisement was published on November 26, 1975, and it announced that bids on contract 75-113-2D for the rehabilitation of sand drying beds at the District's West-Southwest plant in Stickney, Illinois, would be accepted up to January 6, 1976.[1] This announcement specified that the work to be performed required the contractor to remove 67,500 linear feet of clay pipe and 53,200 cubic yards of gravel from the beds and to replace these items with plastic pipe and fresh filter material. Although plastic pipes were called for, the specifications declared that "all pipes * * * must be able * * * to withstand standard construction equipment."

The advertisement further stated that "[t]he cost estimate of the work

---

[1] The original deadline was December 23, 1975. This date was extended to January 6, 1976, by means of an addendum to the advertisement.

under Contract 75-113-2D, as determined by the Engineering Department of the * * * Sanitary District * * * is $1,257,000.00."

A proposal form furnished to Wil-Fred's provided:

"The undersigned hereby certifies that he has examined the contract documents * * * and has examined the site of the work,* * *.

The undersigned has also examined the Advertisement, the 'bidding requirements,' has made the examinations and investigation therein required,* * *.

* * *

The undersigned hereby accepts the invitation of the Sanitary District to submit a proposal on said work *with the understanding that this proposal will not be cancelled or withdrawn.*

*It is understood that in the event the undersigned is awarded a contract for the work herein mentioned, and shall fail or refuse to execute the same and furnish the specified bond within thirteen (13) days after receiving notice of the award of said contract, then the sum of One Hundred Thousand Dollars ($100,000.00), deposited herewith, shall be retained by the Sanitary District as liquidated damages* and not as a penalty, it being understood that said sum is the fair measure of the amount of damages that said Sanitary District will sustain in such event." (Emphasis added.)

On December 22, 1975, the Sanitary District issued an addendum[2] that changed the type of sand filter material which was to be supplied by the contractor. During the bidding period the District's engineering department discovered that the material originally specified in the advertisement was available only out of State and consequently was extremely expensive. This addendum changed the filter material to a less expensive type that could be obtained locally.

On January 6, 1976, Wil-Fred's submitted the low bid of $882,600 which was accompanied by the $100,000 bid deposit and the aforementioned proposal form signed on behalf of the company by Wil-Fred's vice president. Eight other companies submitted bids on January 6. The next lowest bid was $1,118,375, and it was made by Greco Contractors, Inc.

On January 8, 1976, Wil-Fred's sent the Sanitary District a telegram which stated that it was withdrawing its bid and requested return of its bid deposit. This telegram was confirmed by a subsequent letter mailed the same day.

On January 12, 1976, Wil-Fred's, at the request of the Sanitary District, sent a letter setting forth the circumstances that caused the company to withdraw its bid. The letter stated that upon learning the amount by

---

[2] This was the second addendum. The first, which extended the date for submitting bids, was issued on December 17, 1975.

which it was the low bidder, Wil-Fred's asked its excavating subcontractor, Ciaglo Excavating Company, to review its figures; that excavation was the only subcontracted trade in Wil-Fred's bid; that the following day Ciaglo informed Wil-Fred's that there had been a substantial error in its bid, and therefore it would have to withdraw its quotation since performing the work at the stated price would force the subcontractor into bankruptcy; that Wil-Fred's then checked with other excavation contractors and confirmed that Ciaglo's bid was in error; that Wil-Fred's had used Ciaglo as an excavating subcontractor on many other projects in the past, and Ciaglo had always honored its previous quotations; that Ciaglo had always performed its work in a skillful fashion; that because of these facts Wil-Fred's acted reasonably in utilizing Ciaglo's quoted price in formulating its own bid; and that with the withdrawal of Ciaglo's quotation Wil-Fred's could not perform the work for $882,600.

On February 2, 1976, Wil-Fred's received a letter from Thomas W. Moore, the Sanitary District's purchasing agent. Moore's letter stated that in his opinion the reasons cited in Wil-Fred's letter of January 12 did not justify withdrawal of the bid. For this reason Moore said that he would recommend to the Sanitary District's general superintendent that the contract be awarded to Wil-Fred's at the original bid price.

At a February 20 meeting between representatives of the Sanitary District and Wil-Fred's, the company was informed that the District's board of trustees had rejected its withdrawal request, and that it would be awarded the contract. In response to this information, Wil-Fred's filed its complaint for preliminary injunction and rescission on February 26, 1976. The complaint alleged that the company would be irreparably injured if required to perform the contract at such an unconscionably low price or if forced to forfeit the $100,000 bid deposit. The hearing on this complaint commenced on March 10, 1976.

At the hearing William Luxion, president of Wil-Fred's testified that the company had been in business for 18 years; that Wil-Fred's did 13 to 14 million dollars worth of business in 1975; that 95% of the company's work was done on a competitive bid basis; that Wil-Fred's never had withdrawn a competitive bid in the past; and that he personally examined the company's bid prior to its submission. Luxion further stated that he told Wil-Fred's chief estimator to review the company's quotation immediately after he was notified on January 6 that Wil-Fred's bid was more that $235,000 below the next lowest bid. At this time he also requested that Ciaglo Company review its figures.

The reexamination by the chief estimator revealed that there was no material error in the portion of the bid covering work to be done by Wil-Fred's. However, the president of Ciaglo contacted Luxion on January 8

and stated that his bid was too low on account of an error and that, because of this, he was withdrawing his quotation. Upon receiving this information, Luxion sent the Sanitary District the telegram and letter in which he informed the District of this error, withdrew Wil-Fred's bid and requested a return of the company's bid deposit.

Lastly, Luxion testified that a loss of the $100,000 security deposit would result in the company's loss of bonding capacity in the amount of two to three million dollars; that Wil-Fred's decided not to attempt to force Ciaglo to honor its subcontract because the company felt that Ciaglo was not financially capable of sustaining a $150,000 loss; and that he was aware of the Sanitary District's cost estimate before Wil-Fred's submitted its bid. However, Luxion stated that he took the addendum changing the filter material into account when calculating the price of the bid and concluded that this alteration would result in a cost savings of over $200,000.

Dennis Ciaglo, president of Ciaglo Excavating, Inc., also testified on behalf of Wil-Fred's and stated that prior to January 6, 1976, his company submitted a quote of $205,000 for the removal of the existing material in the sand beds, for digging trenches for the new pipe and for spreading the new filter materials. Ciaglo further stated that a representative of Wil-Fred's called him on January 6 and asked him to review his price quotation. During his examination the witness discovered that he underestimated his projected costs by $150,000. Ciaglo said that this error was caused by his assumption that heavy equipment could be driven into the beds to spread the granular fill. Although he was aware that plastic pipes were to be used in the beds, Ciaglo still presumed that heavy equipment could be employed because the specifications called for the utilization of standard construction equipment. Ciaglo first learned that the plastic pipes would not support heavy equipment when, as part of his review of the price quote, he contacted the pipe manufacturer.

Ciaglo testified additionally that his company probably would have to file for bankruptcy if forced to take a $150,000 loss; that Ciaglo Excavating Co. had never before withdrawn a price quotation given to Wil-Fred's or any other company; and that in his opinion the change in the filter material called for by the second addendum would cause a $300,000 reduction in "the cost of the material for the bids* * *."

Only one witness testified for the Sanitary District. Leslie Dombai, a registered structural engineer for the District, stated that the Sanitary District's cost estimate was based directly upon the expense of the material specified in the advertisement, and he confirmed that the filter material was changed because the type initially called for was expensive and was not available locally. However, Dombai claimed that this substitution increased the District's original cost estimate by $40,000.

■■ By bidding on the Sanitary District's rehabilitation project, Wil-

Fred's made a binding commitment. Its bid was in the nature of an option to the District based upon valuable consideration: the assurance that the award would be made to the lowest bidder. The option was both an offer to do the work and a unilateral agreement to enter into a contract to do so. When the offer was accepted, a bilateral contract arose which was mutually binding on Wil-Fred's and the Sanitary District. (*People ex rel. Department of Public Works & Buildings v. South East National Bank* (1st Dist. 1971), 131 Ill. App. 2d 238, 240, 266 N.E.2d 778, 779-80; 11 Williston on Contracts §1441 (3d ed. Jaeger 1968).) When Wil-Fred's attempted to withdraw its bid, it became subject to the condition incorporated in the proposal form furnished by the Sanitary District. Under this condition, the company's bid deposit was forfeited when it refused to execute the contract within the specified time period.

The principal issue, therefore, is whether Wil-Fred's can obtain rescission of its contract with the Sanitary District because of its unilateral mistake. Wil-Fred's argues that the mistake was material to the contract; that this error was directly caused by the Sanitary District's misleading specifications; that the Sanitary District did not alter its position in reliance upon the erroneous bid because the company promptly notified the District of the mistake; and that under these circumstances it would be unconscionable to enforce the contract or to allow the Sanitary District to retain the security deposit.

As a general rule, it is often said that relief will not be granted if but one party to a contract has made a mistake. (*People ex rel. Department of Public·Works & Buildings v. South East National Bank*; Restatement of the Law of Contracts §503 (1932).) However, Professor Williston in his treatise on contracts indicates that unilateral mistake may afford ground for rescission where there is a material mistake and such mistake is so palpable that the party not in error will be put on notice of its existence. 13 Williston on Contracts §1578 (3d ed. Jaeger 1970).

■■ In Illinois the conditions generally required for rescission are: that the mistake related to a material feature of the contract; that it occurred notwithstanding the exercise of reasonable care; that it is of such grave consequence that enforcement of the contract would be unconscionable; and that the other party can be placed *in statu quo*. (*People ex rel. Department of Public Works & Buildings v. South East National Bank*.) Evidence of these conditions must be clear and positive. *Winkelman v. Erwin* (1929), 333 Ill. 636, 640, 165 N.E. 205, 207.

If Ciaglo's misestimation was established by competent evidence, it is apparent that the error was material. This determination is based on the fact that the $150,000 mistake represents approximately 17% of Wil-Fred's bid. See *People ex rel. Department of Public Works & Buildings v. South East National Bank*.

However, the Sanitary District contends that Wil-Fred's failed to support its claim of materiality with clear and positive evidence. The District points out that neither of the plaintiff's two witnesses described the proper method for spreading the new filter material on the plastic pipes, and it argues that because of this omission Wil-Fred's failed to introduce sufficient evidence to substantiate Dennis Ciaglo's conclusion that the correct procedure would have cost $150,000 more than the system he had planned to use.

■■ We do not find this argument persuasive. It is manifest from the trial court's judgment order that the trier of fact decided that Ciaglo's mistake related to a material feature of the rehabilitation contract and that this condition was supported by clear and positive evidence. After carefully examining the record, we are in agreement with this finding.

Dennis Ciaglo testified that he gave Wil-Fred's a price quotation of $205,000 for his work allotment, and he indicated that the amount of this bid was based directly upon his incorrect assumption that heavy trucks could be driven into the sand drying beds and onto the plastic pipes. This testimony is corroborated by the subcontractor's price estimate sheet which was introduced into evidence by the Sanitary District.

It is true, nevertheless, that plaintiff's witnesses failed to describe the correct spreading method, and that Ciaglo made only a conclusionary statement to the effect that employment of the proper procedure would have increased his original quotation by $150,000. However, the District did not cross-examine the subcontractor concerning this matter, and it failed to produce any evidence, testimonial or otherwise, that contravened his statement. Consequently, Ciaglo's conclusion stands uncontradicted.

Furthermore, it is our opinion that the accuracy of the estimated error is supported by the fact that Ciaglo had eight years experience in the excavating business and by the fact that he confirmed this figure by checking with other contractors who had submitted bids on the same portion of the project. Under these particular circumstances we feel that Wil-Fred's produced sufficient evidence to sustain its claim of a $150,000 error.

In addition to satisfying the first condition for rescission, Wil-Fred's has decidedly fulfilled two of the three remaining requirements. The consequences of Ciaglo's error were grave. Since the subcontractor was not capable of sustaining a $150,000 loss, Wil-Fred's stood to lose the same amount if it performed the contract for $882,600. Wil-Fred's will forfeit $100,000 if the contract is enforced. A loss of $100,000 will decrease the plaintiff's bonding capacity by two to three million dollars. It is evident, therefore, that either deprivation will constitute substantial hardship. The Sanitary District was not damaged seriously by the

withdrawal of the bid. When the subcontractor's mistake was discovered 48 hours after the bid opening, Wil-Fred's promptly notified the District by telegram and declared its intention to withdraw. The rehabilitation contract had not been awarded at this time. Accordingly, the District suffered no change in position since it was able, with no great loss other than the windfall resulting from Ciaglo's error, to award the contract to the next lowest bidder, Department of Public Works.

The central question, therefore, is whether the error occurred despite the use of reasonable care. The Sanitary District asserts that the mistake itself evidences Wil-Fred's failure to use ordinary care in the preparation of its bid and argues that rescission is not warranted under such circumstances.

We cannot agree with this contention. Wil-Fred's unquestionably exercised due care when it selected Ciaglo Excavating Company as its subcontractor. Ciaglo Excavating Company had been in business for five years; its president had eight years experience in the excavating field; the company had worked for Wil-Fred's on 12 previous occasions; it had never failed to honor a prior quotation; and it had always performed its assignments in a highly skilled manner. Also, Dennis Ciaglo testified that prior to submitting his bid to Wil-Fred's, he inspected the jobsite and carefully examined the specifications with plaintiff's estimators. Taking into account the experience and preparations of the subcontractor, the prior business dealings between the two companies and the high quality of Ciaglo Excavating Company's past performance, we conclude that Wil-Fred's was justified in relying on the subcontractor's quotation in formulating its own bid.

Similarly, we feel that Wil-Fred's exercised reasonable care in the preparation of its portion of the total bid. The plaintiff made two separate reviews of its price quotation. The first was conducted prior to the bid's submission, and it took into account the addendum that substituted a cheaper filter material for the type originally called for by the specifications.[3] The second examination was made immediately after Wil-Fred's president learned that his company's bid was the lowest quotation. It revealed that plaintiff had not erred in estimating expenses for its part of the rehabilitation project.

---

[3] We believe that the change in filter material explains why the Sanitary District's cost estimate was $374,000 higher than Wil-Fred's quotation. Plaintiff's witnesses testified that the substitution of cheaper material would result in a cost savings of $200,000 to $300,000. Additionally, the Sanitary District's engineer stated that the District's estimate was based directly upon the cost of the material specified in the advertisement, and he admitted that the initial type of filter material was very expensive because it was not available locally. In view of this testimony we must conclude that the large discrepancy would not necessarily have alerted Wil-Fred's president to the fact that there was a substantial error in his company's bid.

■■ The question of due care is a factual question to be determined by the trial court, and such determination will not be disturbed unless it is against the manifest weight of the evidence. *(Santucci Construction Co. v. County of Cook* (1st Dist. 1974), 21 Ill. App. 3d 527, 532, 315 N.E.2d 565, 569.) For the aforementioned reasons we feel that the record supports the trial court's finding of due care on the part of Wil-Fred's.

The Sanitary District asserts that even if due care was exercised by Wil-Fred's, Illinois courts have granted relief only in cases where the bid has contained a clerical or mathematical error. Defendant argues that the trial court's grant of rescission should not be upheld because Ciaglo's mistake was not a factual error but an error in business judgment.

Regarding the District's argument, it is the opinion of this court that Ciaglo's error amounts to a mixed mistake of judgment and fact. Ciaglo's belief that the plastic pipes would support heavy trucks was judgmental in nature and in this narrow sense his mistake was one of business judgment. However, his belief was predicated on a misunderstanding of the actual facts occasioned, at least in part, by his reliance on the Sanitary District's misleading specifications which stated that all pipes had to be able to withstand standard construction equipment.

■■ Generally, relief is refused for errors in judgment and allowed for clerical or mathematical mistakes. (Annot., 59 A.L.R. 809, 827 (1929); Annot., 80 A.L.R. 586 (1932); Annot., 52 A.L.R.2d 792 (1957).) Nonetheless, we believe, in fairness to the individual bidder, that the facts surrounding the error, not the label, i.e. "mistake of fact" or "mistake of judgment," should determine whether relief is granted. *White v. Berrenda Mesa Water District* (1970), 7 Cal. App. 3d 894, 907, 87 Cal. Rptr. 338, 347-48.

■■ The testimonial evidence reveals that Wil-Fred's acted in good faith and that Ciaglo's error occurred notwithstanding the exercise of reasonable care. Furthermore, it was established that Wil-Fred's quotation was $235,775 lower than the next lowest bid. It is apparent that such a sizable discrepancy should have placed the Sanitary District on notice that plaintiff's bid contained a material error. (See *Santucci.*) Accordingly equity will not allow the District to take advantage of Wil-Fred's low offer.

We are aware of the importance of maintaining the competitive bidding system which is used in the letting of municipal construction contracts. Consequently we do not mean to imply by affirming the trial court's order that a bidder who has submitted the lowest quotation on a municipal contract may cavalierly disregard the contract's irrevocability clause and seek rescission. Allowing such action would be unfair to the other bidders and would result in the destruction of the system's integrity. However, we are certain that the courts of this State are capable of

preventing such a result by refusing to grant rescission where, unlike the present circumstances, the facts do not justify relieving the lowest bidder from his bid. See *Calnan Co. v. Talsma Builders, Inc.* (1977), 67 Ill. 2d 213, 367 N.E.2d 695, in which our supreme court, although not dealing with a municipal construction contract, recently denied rescission of a plumbing subcontract where the subcontractor failed to include the cost of the entire water supply system in its bid, a concededly material feature of the subcontract. The supreme court held that the subcontractor had not exercised reasonable care by failing to utilize its own bid preparation review system and by not discovering its error until four months after acceptance of its bid. The court also found that the general contractor could not be placed *in statu quo* since work had begun and the general contractor had no options; it either had to account for the error ($31,000) or had to negotiate another subcontract, at a greater cost with lack of continuity in work.

We note but do not consider the Sanitary District's other arguments which we find to be without merit.

For the above stated reasons, the trial court's order granting rescission and the return of Wil-Fred's security deposit is affirmed.

Affirmed.

STAMOS, P. J., and PUSATERI, J., concur.