MICHAEL S. CUMMINGS *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. LIPH S. DUSENBURY *et al.*, Defendants-Appellants and Cross-Appellees.

Second District   No. 83—1046

Opinion filed December 11, 1984.

Thomas J. DeMik and Howard H. Prestwich, both of Freeport, for appellants.

John A. Leemon, of Mt. Carroll, for appellees.

JUSTICE HOPF delivered the opinion of the court:

Defendants, Liph and Patricia Dusenbury, sold a house to Michael and Lori Cummings, plaintiffs. Soon after moving into the home, the Cummings sued for rescission of the contract for the sale. After a bench trial, the circuit court of Carroll County found that, because of a unilateral mistake, the Cummings were entitled to rescission of the real estate contract and damages, less an amount for rent for the period of time they occupied the premises.

On appeal, the Dusenburys contend that the trial court erred in finding that a unilateral mistake existed so as to allow rescission of the contract and a return to the status quo as existed before the contract was made. The Dusenburys argue that a unilateral mistake does

not allow rescission. Rather, they urge, the mistake must be mutual. The mistake in the present case concerned whether the home purchased by the Cummings was suitable for year-round living. The trial court found that, by the standards in the industry, it was not, and it held that it would be unconscionable to enforce the contract for sale of the home. The Dusenburys also argue that the Cummings did not exercise reasonable care in determining whether or not the home was a "year-round home." They further urge that they have not been placed *in statu quo* and that there was a variance between the pleadings and the proof, *i.e.,* the complaint did not plead unilateral mistake.

The Cummings raise a number of issues by way of cross-appeal. They urge, *inter alia,* that the trial court erred in denying their request for punitive damages and in not determining whether an implied warranty of habitability had been breached.

The house in issue was built by the Dusenburys during the winter of 1973-74. It was a kit home, made of logs, and had a log interior. The Dusenburys lived in it on weekends for several years while selling lots and building other homes at Lake Carroll. In 1977 they lived in the subject house for a year. Some leakage occurred after this, so the windows were removed and set in foam rubber with adhesive. After this, the windows stopped leaking. The roof, Liph Dusenbury testified, only leaked when there was an extremely cold winter with quite a bit of snow. He had no condensation or leakages during the year he lived in the house. He then put the house on the market and leased it to a number of different people, none of whom complained about leaks.

The Cummings first looked at the house in July of 1982. After viewing the property with realtors, they made arrangements to have a realtor contact the sellers and ask specific questions about the home. Realtor Patricia Barrett testified that she called the Dusenburys from her office on July 23, 1982. Barrett testified it was a Saturday, that the Cummings were present in her office and that she probably talked to Mrs. Dusenbury. She asked questions from a list that was introduced into evidence. Barrett asked the questions that had been given to her by the Cummings and wrote down some notes as given by Mrs. Dusenbury. The first question on the list concerned the heating costs and the notation indicated that the electric bill was $120 a month in 1980. Barrett testified that Mrs. Dusenbury said the windows were thermopane, they didn't sweat, and that "it was a year round house." She indicated that the Cummings were concerned about being able to remain warm in the house during the winter.

The Cummings moved into the house in mid-August 1982. Michael

Cummings testified that soon after moving in they found that the roof leaked when it rained. They found that the windows leaked and they had a problem with flies coming into the house. He indicated the fly problem got worse in the winter, and in the wintertime the walls would drip from condensation and were wet to the touch. In the fall when it rained, the roof would leak in three or four places, but when winter started the roof leaked all over the place. Photographs of the leaks from the windows and roof were admitted into evidence. Cummings testified that his 19-month-old child was affected by the condensation on the walls because the furniture had to be moved away from the walls to keep it dry. He also stated that one of the realtors who showed him the house may have suggested that insulation and walls be added to the interior surface.

Duane Hanson testified as an expert for the plaintiffs. He had built many log homes in the area and had inspected the subject house. He saw stains on the wall and signs of moisture on the windowsills. He testified that the homes he built had no moisture problems and that the roof on the subject house needed repairs in the amount of $3,000 to $20,000, depending on how much was done. He noted that some of the sills may have had dry rot forming and that recaulking could eliminate the fly problem. Hanson testified that the minimum property standards for HUD or FHA, as they exist today, would not be met by the house in issue. Hanson testified that while the log home industry began upgrading the thickness of woods in the early 1970s, the subject house was still meant to be a second or vacation home and was not really classified as a year-round house, even at the time it was built.

Arnold Prowant, another building contractor, also testified for plaintiffs. He indicated the roof leaked because it expanded and contracted and recommended that a new roof be placed over the old roof. Because the walls of the house were only about 2½ inches thick, he suggested studding the outside walls with 2 x 4s, putting on a layer of visqueen and fiberglass insulation, and then siding the outside.

Defendant Liph Dusenbury testified that he built the house in the winter of 1973 and spring of 1974. He indicated that the water marks on the interior walls got there during construction and that he replaced the single-pane windows with thermopane windows in 1974. He sold the house on contract to an individual who moved in it for a few months and then defaulted and disappeared. He denied having had a phone call with Pat Barrett on July 23, 1982.

The trial court took judicial notice of the fact that July 23, 1982, was a Friday. The Cummings had testified that realtor Barrett had

made the phone call to Mrs. Dusenbury on a Saturday. Liph Dusenbury stated that he did not talk to realtor Barrett until the closing and he never indicated verbally or in writing that the house was a year-round home.

Patricia Dusenbury testified that during the winter of 1978, during a heavy snow period, she and Liph lived in the house and there had been no problems, although she did indicate there was a roof leak around the fireplace. Some of the defective thermopane windows were replaced. Mrs. Dusenbury also testified that to the best of her knowledge she never spoke with realtor Barrett on the telephone.

■ The first issue raised by the Dusenburys is the contention that the doctrine of unilateral mistake was improperly applied so as to allow rescission of the contract. They contend that only mutual mistake, not unilateral mistake, can justify rescission. They rely on the case of *Diedrich v. Northern Illinois Publishing Co.* (1976), 39 Ill. App. 3d 851, 350 N.E.2d 857. However, *Diedrich* included the following pertinent language: "If by reason of a mistake of fact by *one of the parties* to a contract not due to his negligence, the contract is different with respect to the subject matter or terms from what was intended, equity will rescind the contract where the parties can be placed in status quo. (*Steinmeyer v. Schroeppel* (1907), 226 Ill. 9, 80 N.E. 564.)" (Emphasis added.) (*Diedrich v. Northern Illinois Publishing Co.* (1976), 39 Ill. App. 3d 851, 857, 350 N.E.2d 857.) In light of this language it is apparent that *Diedrich* does not require that a mistake be mutual.

The unilateral mistake principle was also set forth in the following manner:

> "If there is apparently a valid contract in writing, but by reason of a mistake of fact by one of the parties, not due to his negligence, the contract is different with respect to the subject matter or terms from what was intended, equity will give to such party a remedy by cancellation where the parties can be placed *in statu quo*. The ground for relief is, that by reason of the mistake there was no mutual assent to the terms of the contract." (*Steinmeyer v. Schroeppel* (1907), 226 Ill. 9, 13, 80 N.E. 564, 565.)

*Steinmeyer* involved an erroneous calculation made on a bill for lumber. The court found that the contract should not be rescinded on account of this error, for if equity would grant relief on account of such a mistake, there would be no stability in contracts.

In a case that held to the contrary, *Wil-Fred's, Inc. v. Metropolitan Sanitary District* (1978), 57 Ill. App. 3d 16, 372 N.E.2d 946, re-

scission was allowed where a mistake in bidding by a contractor was viewed as (1) a material feature of the contract; (2) so grave that the consequences would work a hardship and be unconscionable; (3) due care was exercised; and (4) the other party could be placed *in statu quo.* The court also noted that relief is generally refused for errors in judgment and allowed for errors which are clerical or mathematical. (*Wil-Fred's, Inc. v. Metropolitan Sanitary District* (1978), 57 Ill. App. 3d 16, 24, 372 N.E.2d 946, 953, citing Annot., 59 A.L.R. 809, 827 (1929); Annot., 80 A.L.R. 586 (1932); Annot., 52 A.L.R.2d 792 (1957).) However, the court looked to the facts surrounding the error rather than the labels of "judgment" or "mathematical" in deciding that rescission of the contract should be allowed.

The doctrine of unilateral mistake was also applied in the case of *National Super Markets, Inc. v. First National Bank* (1979), 72 Ill. App. 3d 221, 390 N.E.2d 602, where a purchaser under a purchase option of a real estate contract sought specific performance. A misunderstanding arose concerning the vendors' failure to strike a 30-day notice of termination provision. Because the purchaser had no reason to know of this misunderstanding, the court held that it should not "be made to suffer the burden of any unilateral mistake or misapprehension resulting from the Trustee's failure to strike the notice language from the agreement." (72 Ill. App. 3d 221, 225, 390 N.E.2d 602, 605.) Although this case is factually distinguishable from the case at bar, it does indicate that unilateral mistake principles have recently been applied to allow rescission of real estate contracts. See also *Bucciero v. Drinkwater* (1982), 13 Mass. App. 551, 434 N.E.2d 1315; *Pearl v. Merchants-Warren National Bank* (1980), 9 Mass. App. 853, 400 N.E.2d 1314.

Generally, the rule is that the unilateral mistake of one party to a contract may not be relied upon to relieve that party from its obligations under the contract where the party's own negligence and lack of prudence resulted in the mistake. *Harney-Morgan Chevrolet Olds Co. v. Rabin* (1983), 118 Ill. App. 3d 602, 606, 455 N.E.2d 130, 134.

*John J. Calnan Co. v. Talsma Builders, Inc.* (1977), 67 Ill. 2d 213, 367 N.E.2d 695, involved a situation where a clerical error was made in a contract. The court set forth the requirements for showing a mistake much as set forth in the case of *Wil-Fred's, Inc. v. Metropolitan Sanitary District* (1978), 57 Ill. App. 3d 16, 372 N.E.2d 946, quoted above. Although the clerical error was viewed as a "material feature" of the contract, the court determined that the plaintiff had failed to exercise reasonable care, and defendant could not be placed *in statu quo.* Thus, the *Calnan* court found that the evidence supporting re-

scission was against the manifest weight of the evidence.

In the case at bar, the Dusenburys argue that the mistake concerned the question of whether the home was a "year-round house." They contend that this is a case of judgment or opinion as opposed to a factual representation. They equate "year-round house" with "good house," "nice location" or "you'll be happy with it." Thus, the Dusenburys equate the phrase with the "puffing" that occurs every day in the marketplace. We disagree. We believe the mistake was a material part of the contract.

In the instant case, the trial court found that the home purchased by the Cummings was not suitable for year-round living. It determined that the mistake made in this regard was material to the contract, such that if it were enforced it would be unconscionable. The court found that plaintiffs had made inquiry on July 23, 1982, in Barrett's office, as to whether the home was a year-round home. Implicit in this finding is the fact that plaintiffs must have been told it was a "year-round" home by defendants.

In its memorandum opinion, the trial court discussed the warranty of habitability doctrine and quoted at length from *Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 441 N.E.2d 324, although the court found that the subject house was not "new" and thus could not be covered by an implied warranty of habitability as set forth by *Redarowicz*. Despite this, it is apparent that the policy of *Redarowicz* was implicitly supportive of the trial court's ruling that the unilateral mistake doctrine operated to allow the rescission here. In any event, we agree that no implied warranty existed in the present case.

■ Applying the principles of unilateral mistake to the case at bar, we believe the Cummings met the basic requirements of that doctrine. The requirements as set forth in *John J. Calnan Co. v. Talsma Builders, Inc.* (1977), 67 Ill. 2d 213, 367 N.E.2d 695, are, first, that the mistake relate to a material feature of the contract. Here, the house in issue is located in an area with severe winters and was purchased for year-round use. Although the question of what constitutes a "year-round" home is somewhat a question of personal taste, there was evidence in the record that this home was built as a vacation house, and was not suitable for winter use by a young family. Although one could argue that the Cummings could have determined for themselves that the house lacked the features necessary for being comfortable in the winter, this argument is somewhat negated by the fact that the record shows they made diligent inquiry into whether it was suitable for winter use. The trial court found that the defendants were aware of plaintiffs' concern in this regard, and that although

defendants indicated they had no problems when they inhabited the house, the fact remains that the house, as sold, was not what plaintiffs had bargained for when they purchased the home. When one buys a house as a primary residence, its suitability for year-round living is a material feature of the bargain.

We believe the plaintiffs exercised reasonable care in ascertaining the suitability of the home for winter living. Although plaintiffs could have called in independent parties for an analysis of the insulation, windows and heating system, the fact that they were advised by the sellers, who had lived in it, that it was suitable for year-round living may have prevented them from looking into the question any further. Although the sellers deny having spoken to the Cummings on July 23, 1982, the trial court specifically found that a call took place on that date. There was ample evidence to support the trial court's determination that reasonable care was used.

The next question is whether the rescission could be made and still place the Dusenburys *in statu quo*. Some guidance on this issue was set forth when the equitable doctrine of rescission was described as follows:

" 'As in other cases of rescission, the vendee is ordinarily required to restore the status quo, insofar as he has received any benefit, as a condition of his right to rescind; but he is not required to put the other party in the same situation in which he was before the contract, where the latter has rendered it impossible by the nature of his fraud or other act, or where from the nature of the land and the purpose for which it was purchased, it is impossible to restore the status quo, as where the purchase was of timberland and the purchaser had cut timber thereon; in such a case all that the purchaser can be required to do is to reimburse the vendor for the value of the timber removed. ***' " *Hakala v. Illinois Dodge City Corp.* (1978), 64 Ill. App. 3d 114, 120, 380 N.E.2d 1177, 1181, quoting from 77 Am. Jur. 2d *Vendor & Purchaser* sec. 565 (1975).

The Dusenburys argue they cannot be put back in the same situation because they made certain changes in the thermostats; because a realtor's/broker's commission was paid; and because they lost possession rights for a year. However, under the terms of the judgment, the Dusenburys were paid $275 monthly rent for the time period they were out of possession. Because of this, and because they had rented the property out in the past, we believe they have been returned to their former position. With regard to the thermostats, there is no indication from the record that the value of the house was affected by

that change.

Regarding the broker's commission, we refer to the quote from *Hakala,* above. As that case indicates, one must be returned to status quo "insofar as [the other] received any benefit." In the case at bar, it does not appear that the Cummings received any benefit from that provision of the contract, or from the fact that the Dusenburys paid their realtor's commission. Thus, we believe that the parties' positions were substantially returned to the status quo.

In sum, the facts and evidence adduced at trial support the trial court's determination that the doctrine of unilateral mistake should allow rescission of the contract.

■ The Dusenburys' final contention is that the Cummings' complaint does not contain the allegations necessary to plead unilateral mistake. They argue that they were not advised that the Cummings would proceed on the unilateral mistake theory. The inference which is to be drawn from this contention is that the Dusenburys were somehow prejudiced by the Cummings' failure to include this point in the pleadings. However, assuming the Dusenburys were prejudiced, they do not say how or in what manner this occured.

It is generally held that a variance between the allegations and the proof will not be deemed material unless it misleads the adverse party to his prejudice. (*Stowell v. Satorius* (1952), 413 Ill. 482, 491, 109 N.E.2d 734, 739.) Here the Dusenburys make no showing of prejudice, and none will be presumed to have occurred.

■ Moving on to the issues raised by the Cummings by way of cross-appeal, their first contention is that the trial court erred in not finding fraud on the part of defendants. They urge that the Dusenburys knew of the problems with the roof, windows and condensation, but never revealed existence of these problems to plaintiffs. If fraud had been found, then the Cummings would have been entitled to punitive or exemplary damages.

Generally, in Illinois fraud consists of a concealment of an existing fact accompanied by scienter, deception and injury. (*Central States Joint Board v. Continental Assurance Co.* (1983), 117 Ill. App. 3d 600, 453 N.E.2d 932; see cases collected at 117 Ill. App. 3d 600, 604, 453 N.E.2d 932, 935.) To establish fraud, the *Central States* court held, there must be concealment with an intention to deceive and under circumstances creating a duty to speak. Although there was some evidence that defendants told plaintiffs that the home was a year-round home, there was no clear showing that this was done intentionally. In fact, the trial court's finding of mistake is blatantly inconsistent with a finding that the Dusenburys intended to deceive the

Cummings. In any event we see no indication in the record of an intentional misrepresentation. Additionally, this issue was presented to the trier of fact and rejected. Because it is a factual question, it is best resolved by the trial court.

▆▆ ▆ The Cummings also contend in their cross-appeal that the implied warranty of habitability should be applicable here. They urge that because they were the first purchasers of the home and because they purchased it from the builder, the doctrine of implied warranty of habitability, as set forth in *Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, 389 N.E.2d 1154, and its progeny, should be applicable. However, we believe this would be too great an expansion of that doctrine for, although it has been expanded to include a change in hands of ownership of a home, it is limited to latent defects which manifest themselves "within a reasonable time after the purchase of the house." (*Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 185, 441 N.E.2d 324.) In the instant case the house was built in 1973-74, and plaintiffs sought to rescind the contract in 1983. Thus, the house was at least nine years old. It also had had a number of tenants. Given this situation it would not be appropriate to find an implied warranty of habitability in this case. See *Schoenrock v. Anden Corp.* (1984), 125 Ill. App. 3d 118, 465 N.E.2d 146.

▆▆ We recognize that countervailing policies such as *caveat emptor* and finality of contract are frequently employed in contract cases. However, in the case at bar evidence shows that the Cummings sought to purchase a year-round home, and the sellers knew of their intended use. The house would apparently need substantial work to the walls and roof in order to solve the problems it currently has. The record shows that the Cummings used reasonable care in inquiring about the suitability of the home. Additionally, the parties were returned to the status quo. Therefore, we believe the equitable relief rescission was properly allowed in the case at bar.

The judgment of the circuit court of Carroll County is affirmed.

Affirmed.

NASH, P.J., and REINHARD, J., concur.