**S.T.S. TRANSPORT SERVICE, INC.,**
Plaintiff-Appellant,

v.

**VOLVO WHITE TRUCK CORPORA-
TION**, Defendant-Appellee.

No. 83–2379.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 4, 1984.

Decided July 2, 1985.

Eugene L. Resnick, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for plaintiff-appellant.

Steven P. Handler, Hannafan & Handler, Chicago, Ill., for defendant-appellee.

Before CUDAHY, COFFEY and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

Plaintiff appeals from a finding of unilateral mistake and rescission of a contract of sale. We affirm the judgment of the district court.

## I.

Plaintiff-appellant S.T.S. Transport Service, Inc. ("S.T.S.") is an Illinois corporation whose principal place of business is located in Alsip, Illinois. Since its incorporation in 1978, S.T.S. has leased tractor trucks and trailers to other companies and has also hauled freight for customers. Volvo White Truck Corporation ("Volvo White") is a Virginia corporation with its principal place of business in Greensboro, North Carolina. There is a branch dealership of Volvo White in Alsip, Illinois. In 1979 and 1980 S.T.S. bought trucks and heavy equipment from White Motor Company ("White Motor"), a truck manufacturer whose assets were purchased in 1981 by Volvo White.

Early in 1981 S.T.S. expressed an interest in purchasing eight new tractor trucks from White Motor in Alsip. In order to avoid a down payment, S.T.S. wanted to trade in trucks it already owned and use its equity in those trucks as a down payment. After appraising the trucks S.T.S. intended to trade in, and after some negotiations concerning the appraised value, White Motor offered to sell S.T.S. eight 1981 Road Commander trucks on the following terms:

(a.) The 1981 Road Commander trucks would be sold to S.T.S. for a price of $58,749 each;

(b.) S.T.S. would trade White Motor one used truck for each new truck purchased;

(c.) S.T.S. would continue to make payments (to financing companies) on the used trucks through July, 1981;

(d.) White Motor would value six of the used trucks at the same amount that S.T.S. would owe on them in July, 1981; $26,560 each;

(e.) White Motor would give S.T.S. a credit of $25,000 on another of the trucks;

(f.) White Motor would arrange financing for S.T.S.

Provision (d.) meant that S.T.S. would receive no credit for any equity in six of the trucks it owned, but that White Motor would simply pay off the amount still owed by S.T.S. on those trucks. The list price of the Road Commander trucks was $80,784. The offer price of $58,749 was reached by adding a profit of $2,200 to the Alsip branch's base cost of $56,549 for the trucks. These terms were confirmed in a March 10, 1981 letter from White Motor to S.T.S. Apparently they were not satisfactory to S.T.S., and negotiations were suspended.

In August, 1981, while White Motor was the subject of bankruptcy proceedings, S.T.S. solicited a new offer from them. White Motor recalculated its costs and sent a letter, dated August 17, 1981, which set out the specifications of the eight Road Commander Trucks, and which concluded with the following paragraphs:

Net delivered price F.O.B. Alsip, including preparation, but excluding state/local taxes is . . . . . . $273,176.00.

We will pay off balance due to White Motor Credit Corporation on the (6) 1979 Western Stars. We assume you will make your payment to White Motor Credit Corporation on December 14, 1981, and then begin a new note with White Motor Credit Corporation effective January 30, 1982, as your first payment on the new equipment. There will be no prepayment return to you, that figure ($9,035) is included in the above figures.

We will also pay off the "estimated" money owed to I.T.T. of $31,755 once your trades are turned in. This is the estimated balance after your November 30, 1981 payment to I.T.T. We will receive the 1978 Freightliner and 1977 Peterbilt as trades and we will also receive the 1979 Western Stars.

Hope this isn't confusing. *I just net'd everything out and gave you the bottom line.* It's a good deal for you for 2 reasons, there is a $3,500.00 U.T.A. on this deal, and we expect 6% 1982 increase by September 1, 1981. You are actually purchasing 1982 units at 1981 prices with $3,500 off on top.

What do you think!!!!!!!!

A moment's calculations makes clear how widely the price suggested in the August 12 letter diverges from the earlier price. Eight trucks at the March 10 price of $58,749 would total $469,992; there was to be no credit for the equity of any of the trucks traded in, except for one, and the credit for that one was to be $25,000. Subtracting that credit from the total for the eight trucks would result in a net price of something just under $445,000. The new net price named in the August letter is some $170,000—over $20,000 a truck—less.

Appellee Volvo White claims that the August figure was the result of a miscalculation. Intending to offer the eight new trucks for the lower price of $56,530 each, for a total of $452,240, White Motor subtracted from that figure not only $42,000 in credit that it was now willing to allow on the trade-in of two trucks, but the $137,064 in assessed value on six other trucks, an amount which equalled the outstanding debt on the trucks. Since S.T.S. was to be credited with no equity on those six used trucks, the assessed value should not have been subtracted from the price of the new trucks. White Motor merely intended to wipe out S.T.S.'s remaining debt on those trucks. By subtracting the amount they did from the price of the new trucks, White Motor in effect offered to credit S.T.S. with an amount equal to the amount of the debt remaining on each truck.

In response to further inquiries by S.T.S., White Motor sent out a second letter on September 2, 1981. This letter was in all respects identical to the August 17 letter, except that in place of the last line of the August letter the September 2 letter contained the following paragraph regarding interest rate charges:

If prime rate increases from todays [sic] rate of 20.5%, your rate to be charged will be 2.5% below the existing prime on date of delivery. If prime decreases, your rate will be the then existing add on rate charged by White Motor Credit Corporation.

Both letters were sent out by Joseph LaSpina, manager of the Alsip branch. LaSpina admitted at trial that he did not review the August 17 letter before it went out, and that he did not review or sign the September 2d letter; his name was signed on the first page by his secretary.

S.T.S. accepted the offer. In December, 1981, S.T.S. turned over to Volvo White all of the trade-in vehicles. S.T.S. also entered into a new lease agreement with Suburban Truck & Trailer, under the terms of which Suburban would lease five of the new trucks from S.T.S. for three years. S.T.S. expected the lease to produce gross income before expenses of $37,876.49 per truck per year.

In January, 1982, the parties became aware of the problem. Volvo White informed S.T.S. that the net purchase price for the new trucks was $452,000, and S.T.S. insisted that under the contract the purchase price was $273,176. On January 15, 1982, Volvo White sent a letter admitting that it had made a clerical error in the contract. It offered to go ahead at the $452,000 price or to call off the transaction, and it confirmed that the eight trade-ins, now in Volvo White's lot, would remain the property of S.T.S. until the deal was closed. Maintaining that it could not use the trade-in vehicles in its new leasing contract with Suburban, and maintaining that under the terms of the contract Volvo White should have taken over payments of the used trucks, S.T.S. neither reclaimed the trucks

nor kept up payments on them. They were repossessed and sold later in the year for approximately $20,000 per truck.

S.T.S. claims that it lost an equity of $70,900 which it had built up in those trade-in units. It also claims that it lost a profit of $372,352 that it would have earned under its lease with Suburban.

S.T.S. had apparently been experiencing some financial difficulty in the latter half of 1981. In January and February, 1982, it sold its remaining tractor trucks. This lawsuit was commenced on June 11, 1982. A trial in the Northern District of Illinois was held during the week of June 13, 1983. S.T.S. sought as damages its lost profits under the Suburban lease. Volvo White counterclaimed for an unpaid balance on parts and materials Volvo White had provided to S.T.S.

The district court found first that S.T.S. had a duty to mitigate its damages. It found that S.T.S. should have gone ahead with the purchase at the higher price, so that it might fulfill its own commitment to provide trucks for Suburban, reserving the right to sue Volvo White for the difference under the U.C.C. It found that since the plaintiff did not mitigate in that way, it could not realize any of the damages it claimed.

But the district judge also found that the contract contained a mistake with respect to the price term, a mistake that would not have been discovered by merely proof-reading the document. Since she found a mistake, she also found that the mistake could be excused and the contract rescinded if the plaintiff could be returned to the *status quo ante*. She found that the costs of the parts and labor which were the subject of Volvo White's counterclaim were incurred in the process of getting the trucks ready for the trade-in, so that the *status quo* could be restored with respect to those obligations by excusing them. On the other hand, she was persuaded by the testimony of witnesses that S.T.S. intended to go out of business at the end of 1981, and that "there is nothing really to restore it to in that regard." Accordingly, she entered

judgment for the plaintiff on the counterclaim but against the plaintiff on its principal claim.

On the question of equity, the district judge found that the used trucks probably could have been sold by S.T.S. for more than they were sold for after repossession, but that since S.T.S. had not taken advantage of the opportunity to reclaim the trucks, it was stuck with the price the trucks had actually been sold for. At that price, there was no equity, since the truck were sold for less than the amount owed on them.

### II.

██ If the contract is void because of a mistake, then there is no question of mitigation, since the duty to mitigate (if there is such a duty) arises out of the breach of a valid contract. Where the court applies the doctrine of mistake, the parties are excused from the contract and consequently there is no breach. Thus, if the district court properly found a mistake concerning the price term and properly voided the contract, we need not reach the issue of mitigation.

The parties have stipulated that Illinois law governs. The sale of the trucks would be governed by the Uniform Commercial Code, chapter 26 of the Illinois Revised Code; but under § 1–103 of the Code, mistake and certain other questions are governed by the common law. 26 Ill.Rev.Stat. § 1–103.

██ Although the traditional case in which a contract is found to contain a mistake is one in which the parties understand a key term differently (hence, a case in which the mistake is mutual), the cases have also voided contracts—though more reluctantly—where only one party is mistaken as to the facts. In the typical case of this sort, a seller or contractor will miscalculate in adding up a list of items. Under the appropriate circumstances courts will now recognize a right to avoidance of this sort of mistake.

It is true that in an early case, *Steinmeyer v. Schroeppel,* 226 Ill. 9, 80 N.E. 564 (1907), the Illinois Supreme Court denied relief to sellers of lumber who had erred in addition of the items in a contract, saying that if it could be set aside for that reason it could be set aside for errors of judgment. 80 N.E. at 566. For example, if the mistake resulted from a miscalculation as to the economic climate, to undo the contract would fly in the face of the very reason for having contracts in the first place. *Wil-Fred's Inc. v. Metropolitan Sanitary District of Greater Chicago,* 57 Ill.App.3d 16, 14 Ill.Dec. 667, 372 N.E.2d 946 (1978). But that problem is solved by excluding miscalculations of judgment. E. FARNSWORTH, Contracts 666 (1982).

■ As the law now stands, three conditions must be fulfilled before a contract can be rescinded: (1) the mistake must relate to a material feature of the contract; (2) it must have occurred despite the exercise of reasonable care; and (3) the other party must be placed in the position it was in before the contract was made. *John J. Calnan Co. v. Talsma Builders, Inc.,* 67 Ill.2d 213, 10 Ill.Dec. 242, 245, 367 N.E.2d 695, 698 (1977); *Wil-Fred's Inc. v. Metropolitan Sanitary District of Greater Chicago,* 372 N.E.2d at 951.

■ The mistake in this case relates to the price, which must be conceded to be material. The mistake must also have occurred in spite of the exercise of reasonable care. Although reasonable care is as difficult to be precise about in this sort of case as it is elsewhere, there are some fairly clear groupings of mistake cases that can serve as guideposts. Most helpful is the knowledge that Illinois courts will generally grant relief for errors "which are clerical or mathematical." *Cummings v. Dusenbury,* 129 Ill.App.3d 338, 84 Ill.Dec. 615, 619, 472 N.E.2d 575, 579 (1984) (citing *Wil-Fred's, Inc. v. Metropolitan Sanitary District, supra*). The reason for the special treatment for such errors, of course, is that they are difficult to prevent, and that no useful social purpose is served by enforcing the mistaken term. No incentives

exist to make such mistakes; all the existing incentives work, in fact, in the opposite direction. There is every reason for a contractor to use ordinary care, and, if errors of this sort—clerical or mathematical—slip through anyway, the courts will generally find it more useful to allow the contract to be changed or rescinded than to enforce it as it is. Naturally there are cases of extreme negligence to which this presumption should not apply; and there is an exception of sorts where the contract has been relied upon. We will have something to say about this last at a later point.

Although it would be wrong to suppose that "merely" mathematical or clerical errors are easily distinguished from other errors such as those of judgment—a miscalculation about the economic climate, say—the distinction is clear enough for ordinary purposes. A merely mathematical or clerical error occurs when some term is either one-tenth or ten times as large as it should be; when a term is added in the wrong column; when it is added rather than subtracted; when it is overlooked.

■ The error involved here is of that sort, but if anything more difficult to detect. The Alsip manager, LaSpina, made the crucial calculations. The assessed value of the used trucks was subtracted from the price of the new trucks. Such a procedure is perfectly appropriate, ordinarily; whoever buys a new car expects to have the price reduced by the value of the trade-in. Here, however, the assessed value was set so as to match the outstanding debt on the trucks. Even so, had the offer been for S.T.S. to pay off the remaining debt on the trucks before they were traded in, the calculation would have been correct. But that was not the offer; Volvo White offered to take over the remaining debt on the trade-ins, so that there was nothing in the way of trade-in value to be subtracted from the purchase price. The assessed value was completely offset by the outstanding debt.

■ However foolish this mistake, once made it would not easily have been detect-

ed. S.T.S. points out that Volvo White conceded in testimony that neither of the two letters containing the term in question were reviewed by LaSpina before going out. But such an omission ought to bar recision only if it would have resulted in the error's being detected. Here, the mistaken calculations were made by LaSpina, and there is little reason to suppose that he would have detected the error had he proof-read the errors before they went out. The error involved, therefore, was not one that would have been detected by the exercise of ordinary care, and we do not think that the trial judge erred in rejecting the defense of negligence.

The question of reliance is no different from the question whether the parties can be put into the position they were in at the time the contract was signed. Here, S.T.S. claims that it lost the equity it had in the trucks traded in. If it did in fact lose those trucks because of reliance on the contract; and if in fact there was equity in the trucks—that is, if the market value of the trucks exceeded the remaining debt; then S.T.S. is entitled to claim that equity as the price of putting it back into the position it would have been in had it not relied on the contract.

The district court found that S.T.S. could have reclaimed its trucks at any time. At the time it became apparent that Volvo White was not going to honor the contract as written, sometime in January, 1982, S.T.S. could have arranged to sell the trucks on its own. A party to a contract cannot be allowed to create damages by continuing to rely on a contract which has either been breached, or been void from the start. As of January, 1982, S.T.S. was on notice that one of those two situations applied.

Moreover, there is no reason why the district court is obliged to do for S.T.S. what S.T.S. could easily have done on its own—namely, sell trucks at the market price. It would have been difficult to ascertain the January, 1982 market price when the trial took place in 1984; it would have been much easier to do by actually selling the trucks when the contract fell through.

Instead, S.T.S. refused to make further payments, and the trucks were repossessed and sold for amounts less than the amounts still owed on each. S.T.S. might have complained of the reasonableness of these sales, but it did not; in any case the sales do not appear to have been unreasonable.[1] The district court therefore correctly found that any loss of equity—if there was equity to begin with—was due to conduct of S.T.S., and that restoring S.T.S. to the *status quo* did not require payment for lost equity.

S.T.S. also incurred certain obligations in preparing the trucks for the trade-in; Volvo White has counterclaimed for repayment of approximately $9500 for parts and services priced during this period. The district judge found that these obligations were legitimately incurred in reliance on the contract and that before the contract can be rescinded those obligations must be excused. She therefore dismissed the counterclaim and rescinded the contract. Volvo White does not reassert its counterclaim on appeal.

Since the district court properly rescinded the contract, the question of mitigation does not arise. The judgment of the district court is affirmed.

---

**1.** The trucks were sold for $20,000 each. Volvo White had appraised the trucks at $22,000–23,000; testimony for S.T.S. would have set the value at $30,000. Considering the conditions under which the trucks were sold, the selling price does not appear unreasonable, whichever estimate of market value we choose.