*In re* SUPPORT OF VETA E. HALFORD.—(AARON T. HALFORD, Petitioner-Appellant, *v.* VETA E. HALFORD, Respondent-Appellee.)

Fifth District   No. 78-350

Opinion filed April 17, 1979.

Burger, Fombelle, Wheeler & Dvorak, of Decatur, for appellant.

Robert Broverman, of Taylorville, for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

This is an appeal by defendant, Aaron Halford, from a judgment of the circuit court of Christian County denying his petition for termination of alimony.

The parties to this action were divorced on December 19, 1974, and by the decree entered that date, Aaron was ordered to pay $40 per week as alimony to Veta Halford. On September 1, 1977, Aaron filed a petition for modification of the decree, seeking the termination of his alimony obligation because of Veta's alleged cohabitation with another man. Although this petition was filed prior to the effective date of the new Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*), it was correctly treated as a petition under section 510(b) of the new Act (Ill. Rev. Stat. 1977, ch. 40, par. 510(b)), which provides in part:

> "The obligation to pay future maintenance is terminated * * * if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." See Ill. Rev. Stat. 1977, ch. 40, par. 801(b).

Veta thereafter filed a motion to dismiss the petition which was denied at the beginning of a hearing conducted on May 4, 1978. The court then heard evidence on the merits of the petition and subsequently entered an order denying the defendant's petition. In this order the court found that there was evidence of a conjugal relationship but that the evidence failed to establish that the "conjugal relationship was one of a continuing nature."

The primary issue on appeal is whether the circuit court's judgment is contrary to the manifest weight of the evidence.

The bulk of the testimony in support of the termination petition came from two witnesses, Veta Halford herself and Bruce Matthews.

Mrs. Halford's testimony was offered under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60). She testified that she is 52 years old and has lived in the same house in Roby, Illinois, for 18 years. The house consists of five rooms, two bedrooms, a living room, a kitchen and a bath. Three other persons live there. They are a daughter, a grandson and Wayne Green, a 46-year-old man. According to Mrs. Halford, Green is a friend whom she has known all of his life. With respect to sleeping arrangements, she stated that her daughter and grandchild sleep on "sleeper-lounges" in the living room and that she sleeps in the north bedroom.

Mrs. Halford further testified that Green has lived in her house for over three years. He is there most of the time unless he is on a hunting trip. Green does not pay rent but gives her $40 a week for food and takes his meals at the house. He is not her daughter's boyfriend. She testified that neither she nor her daughter are "shacked" with him, a term which she understood to mean, "living together, not married." She explained that Green was originally asked to move in by her brother because of problems she was experiencing with nuisance calls and prowlers. Mrs.

Halford then went on to state that she has had sexual intercourse with Green. She believes that they have had intercourse no more than three or four times since he has been living there, the last time being in the winter of 1978.

Bruce Matthews, an ex-son-in-law of Mrs. Halford, testified that his ex-wife, Vicki, and son, Chad, reside in Mrs. Halford's home. He is an acquaintance of Green. He first met him a little over three years ago when Green was dating Mrs. Halford. He began seeing him at her house at that time. Green now lives in the same house with Mrs. Halford, and Matthews sees him quite often, sometimes every day, either in town or at the house in which Matthews visits on the average of four to six days a week. Mrs. Halford and Green still go places together.

When asked what he has personally observed that has led him to the conclusion that Green and Mrs. Halford share the north bedroom, Matthews testified that his ex-wife and son have the south bedroom, which is equipped with a bunk bed. His son keeps his clothes in that bedroom in a chest of drawers and Vicki has her clothes in there as well. Matthews further stated that he has seen Green and Mrs. Halford kiss and touch. In response to the question whether he has seen any other acts between the couple which would lead an ordinary person to the conclusion that they are married, he stated that they live together and "are with each other" and that from what he can see they have a close relationship. There appears to be affection between them at times.

On cross-examination Matthews testified that he has not seen Mrs. Halford dating anyone but Green since her divorce and that he has seen Green work in the yard, cutting the grass. Matthews agreed that by his testimony he was saying that Green and Mrs. Halford are "living together" in her home. He further testified that he has seen his son sleeping in the bunk bed in the south bedroom in the last three years. He was aware, however, that part of the time during the last year his son and ex-wife have slept on daybed couches in the living room because there is a roll of uninstalled carpet in the doorway of the south bedroom which has made it difficult to enter the room.

In other testimony, Matthews stated that at least in the last few months, the top bunk in the south bedroom has been incapable of being slept on since it is loaded down with carpet and padding and that he has not seen anyone sleeping in the south bedroom. He testified further that he has seen Green and Mrs. Halford go into the same bedroom together and that he has been at the house in the middle of the night and seen one or the other of them come out of the north bedroom to answer the door and then return. He also has seen the couple lying together on the couch to watch television.

Mrs. Halford and her daughter, Vicki Matthews, testified in

opposition to the petition. Vicki Matthews testified that Green has slept in the south bedroom during the 13 months she has lived there and is living there because her mother is a diabetic. She further stated that Green and Chad's clothes are both kept in the closet in the south bedroom.

Mrs. Halford, in addition to reiterating some of her former testimony, testified that she slept in the north bedroom and Green in the south even before Chad and Vicki moved in. She further clarified her section 60 testimony by stating that none of the instances of sexual intercourse occurred within the house and that the $40 which Green gives her each week takes care of the soap powder for his clothes and his share of the electric bill as well as what he eats.

The Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*) was modeled after the Uniform Marriage and Divorce Act. Section 510(b) of our Act is drawn in part from section 316(b) of the uniform act (9 U.L.A. §316(b), at 500 (1973); however, the portion with which we are here concerned, that providing for termination of the maintenance obligation if the party receiving maintenance "cohabits with another person on a resident, continuing conjugal basis," is not a part of the uniform act. It is solely a creation of our legislature. Consequently, no guidance as to the meaning of this phrase may be obtained from the case law of the other four jurisdictions which have adopted the uniform act.[1]

We would make the initial observation that section 510(b) is much more specific as to what constitutes grounds for termination of maintenance than was section 18 of the prior Divorce Act (Ill. Rev. Stat. 1975, ch. 40, par. 19), which merely allowed for termination when "reasonable and proper."

By declaring that certain post-dissolution behavior is grounds for termination of the obligation to pay future maintenance, section 510(b) has made a break with past law. The previous rule in Illinois was that a wife's right to alimony was not affected by the moral quality of her post-divorce conduct. (*Hall v. Hall* (1975), 25 Ill. App. 3d 524, 323 N.E.2d 541.) Our task in this case is to determine what conduct was intended by the legislature to be grounds for termination and whether the circuit court erred in finding that the conduct of Mrs. Halford, as established at trial, fell short of that required by the statute.

■■ We believe that it was the intention of our legislature to provide for the termination of an ex-spouse's obligation to pay future maintenance whenever the spouse receiving the maintenance has entered into a husband-wife relationship with another, whether this be by legal or other means.

---

[1] The other jurisdictions which have adopted the Uniform Marriage and Divorce Act are Arizona, Colorado, Kentucky and Montana. *See.* 9 U.L.A. 414 (Supp. 1974-1978).

When a couple takes the steps necessary to become legally married, the marriage certificate itself is sufficient evidence that they have begun a husband-wife relationship, thereby relieving the former spouse of the obligation to pay maintenance to the ex-spouse. However, when such formal steps are not taken by a couple, there is no such conclusive proof of their relationship. Nevertheless, the legislature apparently felt that the supporting spouse should be relieved of his maintenance obligation if his ex-spouse has *in fact* entered into a relationship which amounts to that of a husband and wife. However, in order to protect the spouse receiving maintenance from having it terminated because of a lesser involvement, it was necessary to spell out what the supporting spouse must establish in order to prove that his ex-spouse has begun a husband-wife relationship with another. Our legislature chose to describe the conduct in the following manner: "if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis."

We believe that this statute contemplates acts of sexual intercourse as part of the full or *de facto* husband-wife relationship which it seeks to describe. The term "cohabitation" means living together as husband and wife, but does not necessarily imply sexual intercourse. (*Rasgaitis v. Rasgaitis* (1952), 347 Ill. App. 477, 107 N.E.2d 273.) "Conjugal basis," however, implies the assertion of conjugal rights which have been defined both as "the right which husband and wife have to each other's society, comfort and affection" (Black's Law Dictionary 374 (4th ed. rev. 1968)) and "the right of sexual intercourse between husband and wife" (Webster's Third New International Dictionary 480 (1971)). The statute further requires that the cohabitation be on a resident and continuing basis.

In the instant case, the circuit court apparently found that Mrs. Halford had cohabited with Wayne Green on a resident, conjugal basis, and we agree completely with these findings. The evidence unequivocally showed that Green has resided with Mrs. Halford for over three years. In addition, Mrs. Halford admitted that she had sexual intercourse with Green at least three or four times, and there is ample evidence to show that their relationship was as close and affectionate as a married couple's in other respects. The circuit court, however, found that the evidence failed to establish that the "conjugal relationship was one of a continuing nature." After examining the record, we find that this finding is contrary to the manifest weight of the evidence.

Since Green was living in Mrs. Halford's home at the time of the trial and had been doing so for over three years, we may only conclude that the circuit court felt that the evidence was insufficient to establish the continuing nature of their conjugal relationship because Mrs. Halford admitted only to having sexual intercourse with Green four times, with

the last instance being in the winter of 1978. If a finding of the continuing nature of a conjugal relationship could be avoided by such a simple admission, this statute's purpose could never be achieved. Were sexual intercourse the only element necessary to permit termination, the frequency with which the act is performed would be of greater importance. However, where as here, the couple must also be cohabiting on a resident and continuing basis, proof of the occurrence of sexual intercourse over the time period rather than proof of its frequency is of primary importance. This is especially true since couples engaging in sexual intercourse rarely do so in a manner which subjects them to public view. For this reason, direct evidence of intercourse and its frequency will seldom be available. Consequently, circumstantial evidence and reasonable inferences must play an important role in this type of termination case.

The instant record is replete with circumstantial evidence, which when considered with the admissions of Mrs. Halford, sufficiently establish that the conjugal relationship between her and Wayne Green is one of continuing nature. Bruce Matthews' testimony established that Green dated Mrs. Halford before he moved into her house and that to Matthews' knowledge, Green was the only man she has dated since her divorce. Matthews further established that the couple have had a close relationship since Green moved in which includes kissing, touching, lying on the couch together and other displays of affection. Moreover, although there was conflicting testimony on the point, there is much to suggest that Mrs. Halford and Green share the north bedroom in her house. Bruce Matthews has seen them go into that bedroom together and both of them come out of it in the middle of the night on several occasions. We may reasonably infer from this evidence that there were other instances of sexual intercourse other than those testified to by Mrs. Halford. Further, when consideration is given to Mrs. Halford's admission that she had intercourse with Green in the winter of 1978, that is, within 120 days of the trial, we fail to see how their conjugal relationship could be characterized as anything other than as one of a "continuing" nature.

Mr. Halford has made one other contention in this appeal. He contends that a statement made to Don Anderson by Green, who did not testify at trial, was improperly excluded as hearsay. Although it is not necessary to address this contention in view of our disposition of the previous issue, we feel that due to the nature of the contention, some brief comment is required. It is Mr. Halford's theory that in enacting section 510(b), the legislature recognized a form of common law marriage, and that since the evidence established such a marriage here, thereby making Green Mrs. Halford's common law husband, his statement should have been admitted as an admission against Mrs. Halford made by her agent.

This contention is totally without merit. Besides being incorrect on other grounds, this argument is bootstrapping of the worst order since it assumes as fact the existence of a relationship which was the sole concern of the hearing conducted below.

For the foregoing reasons, we reverse the judgment of the circuit court of Christian County and terminate Mr. Halford's obligation to pay future maintenance.

Reversed.

KUNCE and KARNS, JJ., concur.