*In re* MARRIAGE OF SANDRA HARRIS, Petitioner-Appellant, and HOWARD A. HARRIS, Respondent-Appellee.

First District (1st Division)   No. 1—89—0076

Opinion filed September 17, 1990.

Laser, Schostok, Kilman & Frank, of Chicago (Henry S. Frank, Bruce M. Friedman, and Danni J. Haag, of counsel), for appellant.

Batler and Schwartz, of Buffalo Grove (Jerome Marvin Kaplan, of counsel), for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Petitioner, Sandra Harris, appeals from an order entered by the trial court denying her motion to vacate an agreed order entered on October 29, 1987 (the Agreed Order), which terminated the obligation of respondent, Howard A. Harris, to provide maintenance to Sandra, retroactive to August 1, 1987. On appeal, Sandra contends that the trial court erred in failing to vacate or to modify the Agreed Order on the grounds that: (1) her right to receive maintenance terminated by operation of law prior to the entry of the Agreed Order; (2) Howard fraudulently induced Sandra to enter into the Agreed Order; and (3) the invalidation of Sandra's remarriage effected a fundamental change in circumstances which operated to turn the Agreed Order into an "instrument of wrong." For the following reasons, the judgment of the trial court is affirmed.

The record sets forth the following facts relevant to this appeal. On April 20, 1982, a judgment dissolving the marriage of Sandra and Howard was entered. The judgment incorporated a written marital

settlement agreement, which stated, *inter alia*, that Howard would provide the unallocated sum of $1,500 per month for maintenance and child support. Subsequently, on November 29, 1984, by an agreed order, the settlement agreement was modified to reduce maintenance payments to $1,166.66 per month.

Thereafter, on May 29, 1987, Howard petitioned the court to terminate child support and maintenance or, in the alternative, to reduce maintenance. As grounds for his request, Howard alleged that there had been a substantial change in the circumstances of the parties, *i.e.*, (1) Sandra had substantial assets to support herself; (2) Sandra had supplemental income; (3) Howard had remarried, thereby incurring additional expenses; (4) the children of the parties are emancipated and no longer need support; (5) the younger of the two children now resides with Howard, rather than with Sandra; (6) Howard can no longer afford to support Sandra as he did in the past; and (7) Sandra's monthly expenses have decreased. On October 4, 1987, prior to the hearing on Howard's petition, Sandra remarried. Subsequently, on October 29, 1987, the Agreed Order, from which Sandra appeals, was entered. The Agreed Order provided, in pertinent part:

> "1. Article II of the Marital Settlement Agreement is hereby modified to provide that maintenance shall terminate retroactive to August 1, 1987; provided, however, that the Respondent shall pay to Petitioner the arrearage of Three Hundred ($300.00) Dollars."

On November 14, 1987, Sandra separated from her second husband. Approximately two weeks later, she filed a motion to vacate the Agreed Order, alleging: (1) two of the five life insurance policies that Howard had agreed to maintain had lapsed; and (2) her second marriage was invalid as a matter of fact and law. On December 23, 1987, a declaration of invalidity was entered as to Sandra's second marriage *nunc pro tunc* to October 4, 1987. The grounds for the declaration of invalidity were the second husband's false representations prior to marriage that he would be willing to consummate the marriage. Following a hearing on Sandra's motion to vacate the Agreed Order, the trial court denied the motion. Sandra's appeal followed.

■ Sandra initially contends that, pursuant to section 510(b) of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (Ill. Rev. Stat. 1987, ch. 40, par. 510(b)), Howard's obligation to pay maintenance terminated by operation of law upon her remarriage on October 4, 1987, and the Agreed Order was merely an acknowledgement of the earlier termination. Therefore, Sandra argues that the trial court erred in failing to vacate or to modify the Agreed Order. Sec-

tion 510(b) provides:

> "Unless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." Ill. Rev. Stat. 1987, ch. 40, par. 510(b).

In the present case, the marital agreement was silent as to the termination of maintenance. Thus, section 510(b) was applicable and acted to terminate, by operation of law, Howard's obligation to pay future maintenance upon Sandra's remarriage of October 4, 1987. However, contrary to Sandra's position, Howard's obligation to pay maintenance was not reinstated by the subsequent declaration of invalidity of Sandra's remarriage.

■■ Sandra correctly argues that the pivotal question to resolving the issue of whether the maintenance obligation is reinstated if the remarriage is declared invalid is whether the term "remarriage," as it appears in section 510(b) of the IMDMA, means the ceremony of marriage or the status of marriage. Sandra contends that "remarriage" means "marital status," and if the status is subsequently declared void, the parties are placed in the same position as if the remarriage had never occurred. Contrary to Sandra's position, this court defined the term "remarriage" in *In re Marriage of Kolb* (1981), 99 Ill. App. 3d 895, 425 N.E.2d 1301, to mean a ceremonial marriage rather than a marital status. Although *Kolb* interpreted the term "remarriage" as it appeared in a settlement agreement and not in section 510(b) of the IMDMA, the *Kolb* court's analysis is equally applicable in both contexts.

In *Kolb*, judgment for divorce was entered on October 20, 1972. The judgment incorporated an oral settlement agreement which specifically provided that maintenance payments were to terminate upon the wife's death or remarriage. In early August 1978, petitioner initiated post-decree proceedings alleging that respondent's remarriage on February 12, 1977, had terminated his obligation to make future payments.

At the hearing on the petition, respondent testified that directly after the remarriage ceremony, she and her second husband became involved in a heated argument, he walked out of the reception, and did not return to the hotel. As a result, the marriage was never consummated. Respondent commenced annulment proceedings in August 1977. The trial court entered an order giving full force and effect to

the out-of-State annulment decree and the petition to terminate maintenance payments. Petitioner then filed a motion to reconsider. Following a hearing, the trial court found that, pursuant to the divorce judgment, petitioner's alimony obligation terminated upon respondent's remarriage and was not reinstated by the annulment of the remarriage.

On appeal, the *Kolb* court held that unless the parties specifically indicated otherwise or unless special circumstances existed at the time of remarriage, such as lack of consent due to intoxication or where the wife was physically or mentally handicapped, "the term 'remarriage' is intended to refer to a ceremonial marriage rather than a marital status." (99 Ill. App. 3d at 902.) The *Kolb* court further stated that this definition "offers a predictable and consistent interpretation of the term 'remarriage.'" (99 Ill. App. 3d at 902.) In addressing respondent's argument that it was the parties' intent that the alimony obligation continue until she had entered into a marriage that would provide her with support, the *Kolb* court stated:

> "[I]t would appear that under respondent's view, if she entered a marriage with someone who could not support her, petitioner would be required to continue his support because this would not constitute a 'remarriage' under the terms of the decree." 99 Ill. App. 3d at 900.

In the present case, Sandra attempts to distinguish *Kolb* on the ground that the *Kolb* court had reached its decision based upon the clear intent of the parties as expressed in their settlement agreement. Although the settlement agreement in the present case was silent as to the parties' intent regarding termination of maintenance payments upon remarriage, their intent was clearly expressed to the trial court at the hearing on the petition for dissolution:

> "THE COURT: Are there any termination provisions in connection with maintenance?
>
> [PETITIONER'S COUNSEL]: No, maintenance will continue as long as she is not married.
>
> THE COURT: Oh now, that is different, is that what it says in the agreement?
>
> [PETITIONER'S COUNSEL]: No, the agreement has no terminating features, the agreement will terminate if at all by law, that means in the event she remarries.
>
> THE COURT: I see, since there is no specific provision, that cannot be modified.
>
> [PETITIONER'S COUNSEL]: Yes, sir."

Just as the settlement agreement did in *Kolb*, the aforemen-

tioned colloquy manifests the intent of the parties that remarriage would terminate the maintenance obligation. In fact, Sandra's counsel went one step further than in *Kolb* by specifically acknowledging that because the obligation terminated by operation of law, it could not be modified. While the plain language of section 510(b) provides that maintenance obligations terminate upon remarriage, it does not provide for reinstatement of those obligations in the event the remarriage is declared invalid. Because it is not within the province of this court to inject provisions not found in a statute (*In re Objection of Cook to Referendum Petition of Pierce* (1984), 122 Ill. App. 3d 1068, 462 N.E.2d 557), we decline to inject reinstatement provisions into section 510(b). Accordingly, we hold that the term "remarriage" as it appears in section 510(b) of the IMDMA means the ceremony of marriage and not the status of marriage, and the declaration of the invalidity of Sandra's remarriage did not act to reinstate the maintenance obligation.

In reaching this decision, we note that Sandra's reliance on *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 404 N.E.2d 469, and *In re Marriage of Reeder* (1986), 145 Ill. App. 3d 1013, 495 N.E.2d 1383, which interpret the term "cohabits" as it appears in section 510(b), is inapplicable to an interpretation of the term "remarriage." In essence, Sandra argues that because the *Bramson* and *Reeder* courts interpreted the term "cohabits" as referring to a status situation rather than to a ceremony, such as interpretation should also apply to the term "remarriage" in that both terms appear in section 510(b). By definition, these terms are fundamentally distinguishable from each other. "Cohabitation" is defined as, "To live together as husband and wife." (Black's Law Dictionary 236 (5th ed. 1979).) "Marriage," on the other hand, is defined as the "[l]egal union of one man and one woman as husband and wife." (Black's Law Dictionary 876 (5th ed. 1979).) In Illinois, a "legal union" requires that the marriage between a man and woman be licensed, solemnized and registered pursuant to section 201 of the IMDMA. (Ill. Rev. Stat. 1987, ch. 40, par. 201.) Performance of these requirements constitutes the "ceremony" of marriage. By contrast, the act of cohabiting requires no ceremonial prerequisites. Instead, in determining whether a couple is cohabiting, the court looks to the factual circumstances of the parties' living arrangements to determine if the status of cohabitation exists. (*Bramson*, 83 Ill. App. 3d 765, 404 N.E.2d 469; *Reeder*, 145 Ill. App. 3d 1013, 495 N.E.2d 1383.) Accordingly, the absence of a ceremony as an element of cohabitation renders the judicial interpretation of "cohabits" as a status situation irrelevant to the interpretation of "re-

marriage." The mere fact that the terms "cohabits" and "remarriage" appear in section 510(b) does not demonstrate the legislative intent that they be similarly defined.

Our decision that the term "remarriage" refers to the ceremony of marriage and not to the marital status renders it unnecessary to address Sandra's argument that because her remarriage was rendered void *ab initio*, her marital status before and after the remarriage remained unchanged. Regardless of her marital status, the ceremony had taken place and remarriage, pursuant to the requirements of the IMDMA, had occurred.

Next, Sandra argues that the trial court erred in failing to vacate the Agreed Order on the grounds that Howard had fraudulently induced her to enter into the Agreed Order. As previously stated, paragraph 1 of the Agreed Order modified the marital settlement agreement by stating that maintenance would terminate retroactive to August 1, 1987, provided that Howard pay the $300 arrearage. The Agreed Order further addressed the division of marital investments, Howard's obligations regarding the children's college expenses, and Howard's obligation to maintain certain life insurance policies.

Sandra contends that Howard induced her to enter into the Agreed Order by representing to her that the insurance policies were in full force and effect. In her memorandum in support of her motion to vacate the Agreed Order, Sandra alleged that after signing the Agreed Order, she received notice that two of the life insurance policies had lapsed. Sandra claims that Howard "must have had knowledge" of the lapsed policies at the time they entered into the Agreed Order. Therefore, Howard had fraudulently induced her to sign the Agreed Order and it should be set aside and her maintenance payments should be reinstated.

In order to establish fraudulent misrepresentation, Sandra must show that Howard made a false statement of material fact, that he knew the statement to be false, that he made the statement for the purpose of inducing Sandra to act in reliance on its truth, and that Sandra actually relied upon the statement. (*In re Marriage of Riedy* (1985), 130 Ill. App. 3d 311, 474 N.E.2d 28.) In the present case, there is no evidence that Howard knew that the policies had lapsed at the time the Agreed Order was entered. Further, other than Sandra's self-serving statement in her memorandum of law, there is no evidence in the record that Howard had induced Sandra to agree to the termination of maintenance payments by promising that the life insurance policies were in full force and effect. The only condition set forth in the Agreed Order to the termination of maintenance pay-

ments was that Howard pay the arrearage of $300. Sandra does not contend that this payment was not made. Moreover, it is incredible that Sandra would agree to give up maintenance payments in return for Howard's promise to do that which he was already legally obligated to do pursuant to the marital settlement agreement. Finally, even if fraudulent inducement could be shown, it would have no effect on Howard's obligation to make maintenance payments after Sandra remarried on October 4, 1987, because that obligation terminated by operation of law prior to the entry of the Agreed Order.

■ Next, Sandra argues that the judgment of invalidity of her remarriage effected a fundamental change in circumstances which transformed the Agreed Order into an "instrument of wrong." As previously stated, the Agreed Order had no legal effect on Howard's obligation to make maintenance payments after Sandra remarried on October 4, 1987. Thus, whether the judgment of invalidity of Sandra's remarriage effected a fundamental change in circumstances for the period commencing October 4, 1987, is irrelevant.

Accordingly, although the trial court may have erred in not modifying paragraph 1 of the Agreed Order to refer only to the period of August 1, 1987, to October 4, 1987, the legal effect of the termination of maintenance payments by operation of law or by the Agreed Order is the same. In either situation, Howard's maintenance obligation was not reinstated upon a declaration of the invalidity of Sandra's remarriage.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed.

MANNING, J., concurs.

PRESIDING JUSTICE BUCKLEY, dissenting:
I respectfully dissent.

The previous appellate court opinions interpreting "termination of maintenance on remarriage" provisions in settlement agreements or divorce decrees do not control the instant case, nor are their analyses equally applicable to the instant context. These cases applied established contract principles to interpret the "remarriage" provision. *Lehmann v. Lehmann* (1922), 225 Ill. App. 513, found that the parties intended the word "remarriage" to refer to the ceremony of marriage as distinguished from the status of marriage, stressing that the husband's automatic termination of his alimony payments upon his former wife's re-

marriage and the wife's failure to demand these payments indicated their belief that the payments would terminate upon the ceremony of marriage. *In re Marriage of Kolb* (1981), 99 Ill. App. 3d 895, 425 N.E.2d 1301, concluded that the parties intended the term to refer to the ceremony of marriage rather than the status of marriage by finding no ambiguity in the term as referring to the occurrence of the event of the marriage ceremony. The court, in *Thomas v. Thomas* (1983), 111 Ill. App. 3d 1032, 444 N.E.2d 826, apparently did not agree that the agreement's remarriage term was unambiguous when it looked to other evidence of the parties' intent and found the husband's actions in resuming alimony payments after the declared invalidity of his former wife's marriage evidenced an intent that the term remarriage refer to the status of marriage rather than the ceremony of marriage.

In contrast to the above cases, we are confronted here with a dispute as to the meaning of a statutory provision, where our role is markedly different than the role of determining and giving effect to the intent of interested parties to an agreement. The primary function of a court in interpreting and construing statutes is to ascertain and give effect to the legislature's intent in enacting the statute. (*Faheem-El v. Klincar* (1988), 123 Ill. 2d 291, 527 N.E.2d 307; *Department of Revenue v. Smith* (1986), 150 Ill. App. 3d 1039, 501 N.E.2d 1370.) In performing this function, we must look to the entire statute and consider not only its language but also the reason and necessity of the law, the objective which the statute sought to accomplish, and the evils sought to be remedied. *E.g., City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268* (1988), 122 Ill. 2d 353, 522 N.E.2d 1219; *People v. Haywood* (1987), 118 Ill. 2d 263, 515 N.E.2d 45; *Baksinski v. Corey* (1988), 173 Ill. App. 3d 1016, 529 N.E.2d 232, *aff'd* (1989), 127 Ill. 2d 316, 537 N.E.2d 323; *People v. Moffitt* (1985), 138 Ill. App. 3d 106, 485 N.E.2d 513.

Illinois case law interpreting the cohabitation provision in section 510(b) demonstrates the objectives the legislature sought to accomplish in providing for the termination of maintenance in the situations specified in that section. The legislature added the provision terminating maintenance upon the recipient spouse's cohabitation with another "on a resident, continuing conjugal basis" to end the inequities caused by Illinois' nonrecognition of common law marriages, when a former spouse who had entered into a nonlegalized husband-wife relationship was still entitled to maintenance. (*In re Marriage of Reeder* (1986), 145 Ill. App. 3d 1013, 1017, 495 N.E.2d 1383, 1385; *In re Marriage of Olson* (1981), 98 Ill. App. 3d 316, 320-21, 424 N.E.2d 386, 396; *In re Marriage of McGowan* (1980), 84 Ill. App. 3d 609, 614, 405 N.E.2d 1156, 1160-61; *In*

*re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 661, 404 N.E.2d 469, 472.) In construing this "cohabitation" provision, Illinois courts have concluded that the legislative intent behind section 510(b) was to provide for the termination of maintenance whenever the recipient has entered into a husband-wife relationship (*Reeder*, 145 Ill. App. 3d at 1017, 495 N.E.2d at 1385; *In re Support of Halford* (1979), 70 Ill. App. 3d 609, 612, 388 N.E.2d 1131, 1134) and that the legislature's inclusion of such a provision relates to the underlying rationale of maintenance— the need for support by the spouse who is to receive maintenance (*Reeder*, 145 Ill. App. 3d at 1017-18, 495 N.E.2d at 1385-86; *Bramson*, 83 Ill. App. 3d at 663, 404 N.E.2d at 473). In so doing, Illinois courts rejected the contention that the legislature was attempting to control public morals by providing for maintenance termination on cohabitation. *Reeder*, 145 Ill. App. 3d 1013, 495 N.E.2d 1383; *Bramson*, 83 Ill. App. 3d 657, 404 N.E.2d 469.

I do not believe the legislature's intent, in providing for termination of maintenance upon "remarriage," was to pass judgment on the equities of a supporting spouse's obligation to pay maintenance when the recipient spouse had entered into a ceremony of marriage with another person. Rather, consistent with the conclusions reached by the above courts, I believe the legislature's objective was to terminate maintenance in situations it believed affected the need for maintenance, namely, where the recipient spouse enters into the status of a husband-wife relationship. Under section 510(b), the marriage certificate itself sufficiently evidences this husband-wife relationship; whereas, in the absence of a legal marriage, the statute describes the conduct the supporting spouse must establish to prove such a relationship—cohabitation with another on a resident, continuing conjugal basis. (See *Halford*, 70 Ill. App. 3d at 613, 388 N.E.2d at 1134.) It necessarily follows that maintenance is not terminated under the statute where the legal marriage or marriage certificate which evidenced the "status" of marriage or husband-wife relationship is legally declared invalid.

Accordingly, since the legal "marriage" which established Sandra's marriage status was legally declared invalid, I would hold that Howard's maintenance obligation was not statutorily terminated. This holding would render it necessary to address the issue not reached in the majority opinion of whether the trial court erred in denying Sandra's motion to vacate the October 29 Agreed Order, entered subsequent to her remarriage and before the order declaring the invalidity of the marriage, on the ground that it did not operate to terminate maintenance under these circumstances.

The parties have not offered any case law which governs the instant

circumstances. Because the provisions of a settlement agreement are to be interpreted by normal contract rules (*Ingrassia v. Ingrassia* (1987), 156 Ill. App. 3d 483, 494, 509 N.E.2d 729, 737; *In re Marriage of Kloster* (1984), 127 Ill. App. 3d 583, 584-85, 469 N.E.2d 381, 383), I believe the application of contract principles governs the determination here.

At the time Sandra entered into the Agreed Order, she believed that Howard's maintenance obligation was already terminated by her remarriage and by operation of law when, in fact, Howard's maintenance obligation was not statutorily terminated due to the subsequently declared invalidity of the marriage. Sandra was mistaken as to the law in the inducement to the contract rather than in the writing of it; or, more simply stated, she was mistaken as to the law governing her situation prior to entering into the bargain. See 13 W. Jaeger, Williston on Contracts, §§1588, 1589 (3d ed. 1970).

While the general rule is that equity will relieve for mistakes of fact but not mistakes of law (13 W. Jaeger, Williston on Contracts, §1582 (3d ed. 1970)), courts generally recognize an exception where the mistake relates to the private rights of the parties as distinguished from a mistake as to the general law. (*E.g., Peter v. Peter* (1931), 343 Ill. 493, 500, 175 N.E.2d 846, 850; *Esquibel v. Brown Construction Co.* (1973), 85 N.M. 487, 513 P.2d 1269; *Ryan v. Vickers* (1965), 158 Colo. 274, 406 P.2d 794; *Furnace v. Furnace* (Tex. App. 1989), 783 S.W.2d 682; *In re Commonwealth Trust Co.* (1947), 357 Pa. 349, 54 A.2d 649.) In *Peter*, our supreme court explained:

> " 'Wherever a person is ignorant or mistaken with respect to his own antecedent and existing private legal rights *** either of property or contract or personal status, and enters into some transaction the legal scope and operation of which he correctly apprehends and understands, for the purpose of affecting such assumed rights, *** equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact.' " (*Peter*, 343 Ill. at 500, 175 N.E.2d at 850, quoting Pomeroy, Equity Jurisprudence, vol. 2, §849 (3d ed. 1905).)

Such a situation exists in the case at bar. Sandra was mistaken as to her existing private legal rights at the time she entered into the agreement. The fact that at the time of the agreement the statute operated to terminate Howard's maintenance obligation and it only later developed that the statute did not operate to terminate his obligation does not render the exception inapplicable. In *Ryan v. Vickers* (1965), 158 Colo. 274, 406 P.2d 794, where an agreement was entered into between a lessee and the lessee's landlord affecting the lessee's debt obligations under the belief that the landlord's lien took precedence over a third-party's

lien when, in fact, it was ultimately determined in court that the third-party's lien had priority over the landlord's lien, the court held that the above exception applied to vitiate the contract. *Ryan*, 158 Colo. at 279, 406 P.2d at 797.

In applying these contract principles here, I am cognizant that the cases disclosed by my research have involved situations where the parties were mutually mistaken as to the parties' private legal rights. The record here does not demonstrate whether Howard was aware of Sandra's remarriage and therefore mistaken as to the termination of his maintenance obligation at the time he entered into the agreement. Nonetheless, Illinois law suggests that, under the instant circumstances, the fact that only one party was mistaken in this regard would not preclude equitable relief.

The common law rule that rescission is not available for unilateral mistake except where the other party knows or has reason to know the mistake has been eroded in many jurisdictions by an increasing number of cases which have permitted avoidance where only one party was mistaken. (J. Calamari & J. Perillo, Contracts, §9—28 (2d ed. 1979).) Illinois courts have held that a court of equity may rescind an agreement at the request of one party who entered into it without negligence, through a material mistake of fact, where the parties can be placed in status quo. *Cummings v. Dusenbury* (1984), 129 Ill. App. 3d 338, 342, 472 N.E.2d 575, 578; *McCracken Contracting Co. v. R.L. DePrizio & Associates, Inc.* (1984), 122 Ill. App. 3d 680, 686, 462 N.E.2d 682, 686; *Harney-Morgan Chevrolet Olds Co. v. Rabin* (1983), 118 Ill. App. 3d 602, 606, 455 N.E.2d 130, 134; *Steinmeyer v. Schroeppel* (1907), 226 Ill. 9, 13, 80 N.E. 564, 565.

Equity demands that the Agreed Order be rescinded in the case at bar. The mistake here was material to the contract, as it is inconceivable that Sandra would have assented to relinquish all her rights to maintenance had she been aware that she was legally entitled to maintenance. Additionally, because the Agreed Order was entered within weeks of her remarriage, it cannot be said that she entered into the contract due to any lack of diligence on her part. Finally, by rescinding the Agreed Order, the parties would be placed in status quo, as Howard may proceed with his petition to reduce maintenance before the circuit court. Under these circumstances, I would hold that the trial court's refusal to vacate the agreed order was an abuse of its discretion.