*In re* MARRIAGE OF PATRICIA TOOLE, Petitioner-Appellee and Cross-Appellant, v. MICHAEL TOOLE, Respondent-Appellant and Cross-Appellee.

Second District  No. 2—94—0858

Opinion filed July 27, 1995.—Rehearing denied August 24, 1995.

608

RATHJE, J., dissenting.

Larry S. Kajfes, of Larry S. Kajfes, Ltd., of Chicago, for appellant.

John J. Piccione and Mark W. Tader, both of Piccione, Keeley & Associates, of Wheaton, for appellee.

PRESIDING JUSTICE McLAREN delivered the opinion of the court:

Petitioner, Patricia Toole, and respondent, Michael Toole, ended their marriage of 22 years with a judgment of dissolution entered on June 29, 1994. Michael filed a timely notice of appeal, and Patricia filed a cross-appeal. We affirm in part, reverse in part, and remand.

The record reveals that Patricia and Michael married on December 11, 1971. The parties have two children. At the time of the dissolution, Kristie had attained the age of majority and Jodie was 17 years and 11 months old.

When Michael and Patricia first married, Michael worked at a family-owned construction company, Potteiger Corporation. Michael was promoted to superintendent at Potteiger in 1973 or 1974. In 1986, the Tooles moved to Illinois, where Michael was employed as a construction superintendent for Morris Diesel until 1992. At the time of trial, Michael was employed by CCI Construction Company, Inc. (CCI), as a construction superintendent, receiving a salary of $62,000

per year. Michael had also received a $1,000 bonus in 1993 and an $8,500 bonus in March 1994. His position with CCI requires him to travel to various locations. At the time of trial, Michael was working at a construction site in Louisiana. CCI provided Michael with a hotel room in Louisiana, $25 a day for food, and a truck, with insurance and maintenance paid for by CCI.

Patricia married Michael when she was 17 and subsequently held various positions of employment not relevant to this disposition. Beginning in 1987, Patricia worked for three years as an employment counselor, or "headhunter," for a company called West Personnel (West). At that time, a college degree was not required for the position of employment counselor at West. In her last year with West, Patricia earned $34,000 to $35,000. After her separation from Michael, Patricia earned an Arizona real estate license and sold real estate from July 1992 to January 1993, during which time she earned $3,300 while incurring approximately $2,000 in expenses. From April 1993 to the time of trial, Patricia worked for the Arizona Department of Economic Security and was paid $7.98 an hour to assist people in finding jobs. A position entitled "case manager/human services," comparable to Patricia's position with West in Illinois, exists with the State of Arizona. However, the case manager position requires two years of college. Patricia estimated it would take her four years of part-time attendance to obtain a two-year college degree.

We will detail other facts pertinent to this opinion in our corresponding discussion on the issues below.

### I. MAINTENANCE

Michael and Patricia separated in February 1990. Subsequently, Patricia and the two daughters moved in with David Hughes, an unrelated adult male, in California.

Patricia testified that she signed a lease, with a month-to-month tenancy, for an apartment in Arizona, roughly 25 miles from Hughes' house, and, on a weekend break during the trial below, moved out of Hughes' house and into her new apartment. She testified that she was not going to continue living with Hughes.

The trial court found that Patricia resided on a conjugal basis with Hughes from the period of separation until May 15, 1994, which was in the middle of the trial proceedings, and it therefore denied granting temporary maintenance to Patricia. However, the trial court ordered Michael to pay rehabilitative maintenance in the amount of $800 per month for 36 months. We reverse the granting of rehabilitative maintenance because of Patricia's participation in a conjugal relationship and note that our resolution of this issue has not been previously articulated in this State.

Initially, we note that we pass no moral judgment on Patricia's cohabitation with Hughes. The intention of the legislature in providing for the termination of an ex-spouse's obligation to pay maintenance when the ex-spouse receiving the maintenance has entered into a husband-wife relationship with another, whether by legal or other means, is not an attempt to control public morals. (*In re Marriage of Sappington* (1985), 106 Ill. 2d 456, 467, quoting *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 663.) Rather:

> " '[A]n important consideration, divorced from the morality of conduct, is whether the cohabitation has materially affected the recipient spouse's need for support because she either received support from her co-resident or used maintenance monies to support him.' " (*Sappington*, 106 Ill. 2d at 467-68, quoting *Bramson*, 83 Ill. App. 3d at 663.)

Thus, in the case at bar, we neither condemn nor extol Patricia's conjugal cohabitation with Hughes.

Section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) directs that a court may grant either permanent or temporary maintenance "after consideration of all relevant factors." 750 ILCS 5/504(a) (West 1992).

■ In authorizing rehabilitative maintenance, the Act aims to "provide incentive for the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency." (*In re Marriage of Chegar* (1991), 213 Ill. App. 3d 371, 378.) The propriety of a maintenance award and the amount and duration thereof are matters which lie within the discretion of the trial court and will not be disturbed absent an abuse of discretion. (*In re Marriage of Carini* (1983), 112 Ill. App. 3d 375, 381.) An abuse of discretion in this area occurs where "no reasonable man would take the view adopted by the trial court." *Chegar*, 213 Ill. App. 3d at 378.

The Act also provides:

> "Unless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, *the obligation to pay* future maintenance *is terminated* upon the death of either party, or the remarriage of the party receiving maintenance, *or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis.*" (Emphasis added.) (750 ILCS 5/510(c) (West 1992).)

This section of the Act is generally utilized in an action by one spouse seeking the modification or termination of maintenance payments granted the other spouse under section 504. (750 ILCS 5/504 (West 1992); see, *e.g.*, *Sappington*, 106 Ill. 2d 456.) A court of review will not reverse the trial court's finding concerning the existence of a conjugal

relationship unless that finding is contrary to the manifest weight of the evidence. *In re Marriage of Herrin* (1994), 262 Ill. App. 3d 573, 576.

■ The trial court's finding that Patricia cohabited with David Hughes on a "resident, continuing conjugal basis" (750 ILCS 5/510(c) (West 1992)) is not against the manifest weight of the evidence. The record reveals that Patricia and Hughes shared meals, bank accounts, household chores, and credit accounts, as well as exchanged holiday and birthday gifts. The two also took vacations together and maintained a sexual relationship. Thus, the trial court's decision to deny temporary maintenance to Patricia was not contrary to the manifest weight of the evidence.

In light of its finding of a conjugal relationship, however, the trial court erred in granting Patricia rehabilitative maintenance. In *In re Marriage of Klein* (1992), 231 Ill. App. 3d 901, the trial court granted maintenance to a wife in a marriage dissolution proceeding despite the wife's admission that she was cohabiting with another man. (*Klein*, 231 Ill. App. 3d 901.) The Appellate Court, Fourth District, reversed, stating:

> "*There should be no distinction between whether petitioner's obligation is terminated before* it ripens *or after* maintenance is ordered. If a party died before maintenance was awarded, or if a party remarried before the award, there would be no reason for awarding maintenance only to then require it to be terminated pursuant to section 510(c). Similarly, if a party who seeks maintenance cohabits before maintenance is awarded, the award should be denied pursuant to section 510(c). [Citation.]" (Emphasis added.) (*Klein*, 231 Ill. App. 3d at 905.)

We agree, contrary to the dissent herein, which we believe emphasizes the incorrect antecedent for the verb "terminated"; it is the "obligation" to pay which is terminated, not "maintenance," under section 510(c). (750 ILCS 5/510(c) (West 1992).) Thus, the dissent's point that the wife in the instant case had received no maintenance is of no consequence. Furthermore, where a party died before maintenance was awarded, the granting of maintenance has been determined to be error. (*Stacke v. Bates* (1990), 200 Ill. App. 3d 85, 91.) Also, where a recipient of maintenance remarried but had the subsequent marriage declared invalid, the appellate court determined that the reinstatement of the maintenance provisions from the first marriage was properly denied. (*In re Marriage of Harris* (1990), 203 Ill. App. 3d 241, 246.) Thus, because Patricia cohabited on a resident, continuing conjugal basis with Hughes, and Patricia and Michael did not subsequently reconcile, Michael's obligation to pay all forms of

maintenance, including rehabilitative maintenance, has been terminated.

We determine that the fact that Patricia moved out of Hughes' residence during the course of the trial below should not have influenced the trial court's decision to grant rehabilitative maintenance. The rationale regarding granting maintenance under section 504 (750 ILCS 5/504 (West 1992)) expressed in *Klein* should not be limited to situations where, as the facts indicated in *Klein*, the conjugal cohabitation is currently occurring (*Klein*, 231 Ill. App. 3d at 903). Instead, we determine that maintenance should not be awarded where the party looking to receive maintenance is either cohabiting, or has cohabited, on a conjugal basis with another party since the inception of the marriage, absent a subsequent reconciliation. As the appellate court noted in *In re Marriage of Harris*:

> "While the plain language of section 510(b) [now (c)] provides that maintenance obligations terminate upon remarriage, it does not provide for reinstatement of those obligations in the event the remarriage is declared invalid." (*Harris*, 203 Ill. App. 3d at 246.)

Likewise, we determine that the reinstatement of maintenance obligations where a party has cohabited on a conjugal basis, but is no longer cohabiting on a conjugal basis, is not provided for by statute. Once the obligation to pay maintenance terminates, nothing in the Act provides for its revival.

We determine that it is necessary to consider the factors listed in section 510 of the Act as prerequisites to considering whether maintenance can be granted under section 504 of the Act. Our determination is bolstered by the very language of section 504(a), which states that maintenance should be awarded "after consideration of *all* relevant factors, *including* [those delineated]." (Emphasis added.) (750 ILCS 5/504(a) (West 1992); see also *Klein*, 231 Ill. App. 3d at 905; *In re Marriage of Schlosser* (1993), 241 Ill. App. 3d 49, 52 (the court interprets the same language in the predecessor to section 504 (see Ill. Rev. Stat. 1991, ch. 40, par. 504(b)), to indicate a "nonexclusive list").) Moreover, section 504 also includes, as part of its nonexclusive list of factors, "any other factor that the court expressly finds to be just and equitable." (750 ILCS 5/504(a)(12) (West 1992).) We determine that it is not only just and equitable to consider the factors listed in section 510(c), but also it is statutorily required when awarding maintenance pursuant to section 504.

We note that, in an earlier opinion which involved the death of a spouse who was to pay maintenance, this court declined to apply the factors delineated in section 510(c) to an action arising under section 504. (*Stacke*, 200 Ill. App. 3d at 90.) However, section 504 was

amended, effective January 1, 1993, after the *Stacke* decision, to include, for the first time, the language cited above in section 504(a)(12). 750 ILCS 5/504(a)(12) (West 1992).

In light of our determination, we need not consider Michael's other claims regarding the trial court's finding that the conjugal relationship between Patricia and Hughes had ended, that Patricia voluntarily reduced her income to live with Hughes, and that Patricia's claim of ill health is unsubstantiated.

We conclude the trial court erred when it granted rehabilitative maintenance once it had determined that there was a conjugal relationship without a subsequent reconciliation. We therefore reverse that portion of the judgment granting maintenance.

## II. DIVISION OF MARITAL PROPERTY AND DISSIPATION OF MARITAL ASSETS.

The trial court found the following items, listed with what the court found to be their respective values, to be marital property:

"1. Proceeds from the sale of the parties[']
   residence at 2400 Bluemont Court
   Naperville, Illinois                         $66,049.00
 2. Principal Financial
   Group IRA                                    $25,000.00
 3. Reimbursement of the 1986
   tax obligation                               $27,883.00
 4. 1994 Jeep Cherokee                          $15,500.00
 5. Mazda Automobile                            $     00.00
 6. Plaintiff's deferred
   Compensation Plan                            $    500.00
 7. Reimbursement of funds
   dissipated by the Defendant                  $15,521.00
                      TOTAL                      $136,503.00."

In arriving at the above, the trial court found that $44,000 paid by Michael to his parents from the house proceeds was a gift, not a payment on a loan as Michael had contended, and included the $44,000 in its figure for the proceeds from the house. Also, the trial court found that Michael had dissipated $8,500 from his Morse-Diesel IRA and $7,021 from the parties' home equity loan—together, $15,521, listed as point 7 above. The court found that these expenditures occurred after the parties had separated. The court distributed 60% of the marital property to Patricia and 40% to Michael.

On appeal, the issues are whether the trial court erred in finding:

(1) Michael dissipated $15,521; (2) Patricia did not have to reimburse Michael for the payment of household expenses; (3) Patricia did not dissipate the value of her Mazda automobile; (4) the $44,000 payment out of the house proceeds from Michael to his parents was not repayment on a loan; and (5) Michael must reimburse the marital estate in the amount of $27,883 with respect to the parties' 1986 tax obligation.

Our standard of review with regard to the property division is whether the trial court abused its discretion in dividing the marital property. (*In re Marriage of Morris* (1994), 266 Ill. App. 3d 277, 281.) "The question is not whether we agree but only whether the trial court exceeded the bounds of reason so that no reasonable person would take the view adopted by the trial court." *Morris*, 266 Ill. App. 3d at 281.

■ The doctrine of dissipation applies to allegedly improper expenditures of marital funds for purposes unrelated to the marriage, at a time after the marriage has irretrievably or irreconcilably broken down. (*In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 496.) A party charged with dissipation carries the burden of proving he did not, in fact, dissipate assets. *In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881, 886.

The trial court's finding that Michael had dissipated $15,521 was not an abuse of discretion. Michael claims he has "properly documented" family expenses and "loan pay-back reasons" for all of the challenged expenditures. However, our review of the record fails to support this contention. In Michael's evidence exhibit No. 6A, Michael apparently wrote the names of various entities to which he paid money from April through June of 1990. His testimony detailed some of these payments, but left much to be desired with regard to others. For example, he lists "Shell Oil Co.," "Corestates Visa," and "Firstar Naper Bank" as "Item[s]," with substantial monthly payments going to all three entities, but does not itemize these payments further. "General and vague statements that funds were spent on marital expenses or to pay bills are inadequate to avoid a finding of dissipation." (*In re Marriage of Tietz* (1992), 238 Ill. App. 3d 965, 984.) Moreover, the court heard uncontested testimony from Patricia regarding the amount owed on credit cards when she left the marital residence after Michael had cut up her credit cards and it saw the amounts which Michael had subsequently paid to the various credit card entities.

In her cross-appeal, Patricia argues that the trial court erred in limiting the amount of Michael's dissipation to $15,521. We determine that the trial court's finding as to the amount of dissipa-

tion does not amount to an abuse of discretion. The record is clear that Michael paid more than $15,521 on the credit cards after Patricia left the marital residence. However, Michael's testimony detailed *some* household expenses, and listed them in his exhibit No. 6A, which were incurred after Patricia had left the marital home. The trial court, exercising discretion, could properly have subtracted some or all of these delineated amounts from the amounts tallied on the credit cards.

Patricia also argues that Michael should have been found to have dissipated $2,000 because Michael's girlfriend stayed at Michael's apartment in Pennsylvania, without paying rent or expenses, while Michael was being housed in a Louisiana motel by his employer. She implies that Michael did not need the apartment in Pennsylvania. However, simply because Michael's employer moves him from location to location and pays for his hotel room does not mean Michael should be constrained to live as a nomad, with no permanent residence. Thus, we do not find the trial court's finding as to the amount of the dissipation an abuse of discretion.

■ Michael contends that the trial court erred by not ordering Patricia to reimburse Michael for the payment of household expenses incurred after Patricia left the marital residence. Michael alleges that these expenses were marital debts. A divorcing spouse is required to prove, by a preponderance of the evidence, that he or she is entitled to expenses for the maintenance of marital property to be entitled to credit for the expenses. (*In re Marriage of Irvine* (1991), 215 Ill. App. 3d 629, 634.) As we noted, however, the trial court did not grant Patricia the full amount of the credit card bills that Michael paid after the separation, which Michael claims were for "proper and marital purposes." By not granting Patricia the full amount of expenditures that Michael paid by using credit cards, it is apparent that the trial court took into account the household expenses which Michael paid after the separation. Thus, we determine the trial court did not abuse its discretion in failing specifically to order Patricia to pay household expenses.

■ Michael also urges this court to determine that the trial court erred by finding Patricia had not dissipated the value of her car. The trial court's order listed the value of a Mazda automobile—which Patricia in her brief describes as a 1990 Honda—as zero. We agree with Michael that finding zero value is against the manifest weight of the evidence; the car must have had some value. Patricia's brief admits that Patricia traded in the car to a California dealer and received an $11,000 credit. Directly following the trade-in, Patricia bought a truck for her daughter Kristie for $6,500, gave $5,000 to her daugh-

ter Jodie to buy a vehicle, paid $5,000 to her attorneys, and paid cash for a Buick Roadmaster that was entitled solely in David Hughes' name. In light of these transactions, we agree with Michael that Patricia dissipated the value of her car.

■ Despite this determination, we also determine that the trial court's property division between the parties was not so unreasonable that we are convinced that the apportionment of the marital property, as a whole, should be disturbed. The trial court's error in not finding Patricia to have dissipated the value of her car, for which the car dealer gave Patricia an $11,000 credit, did not constitute prejudicial error in light of the trial court's entire distribution scheme of the estate otherwise valued at $136,503. See *In re Marriage of Schuster* (1992), 224 Ill. App. 3d 958, 977 (court refused to remand property division when husband discovered after trial a settlement wife received, of which husband claimed to be entitled to $1,853, in light of the trial court's entire distribution scheme of an estate valued at $555,206); see *In re Marriage of Brooks* (1985), 138 Ill. App. 3d 252, 262 ("relatively minor errors" in valuation, which totalled roughly $36,500 of an estate valued at $460,000, do not require a disturbance of the property division on appeal); see *In re Marriage of Weinstein* (1984), 128 Ill. App. 3d 234, 248 (a possible error in valuation concerning jewelry with a value of $4,300 would not disturb the property division of an estate otherwise valued at $115,000).

■ We also will not disturb the trial court's finding that the underlying $44,000 transaction between Michael and his parents was a gift, not a loan. Because Michael paid $44,000 to his parents out of the proceeds from Michael's and Patricia's house, the trial court ordered Michael to repay $44,000 to the marital estate because of this finding. In Illinois, a transfer from a parent to a child is presumed to be a gift. (*In re Marriage of Marcello* (1993), 247 Ill. App. 3d 304, 314.) This presumption may only be overcome by clear and convincing evidence to the contrary. *Marcello*, 247 Ill. App. 3d at 314.

In the case at bar, the trial court's determination that the presumption was not overcome is not against the manifest weight of the evidence. True, Michael's father, Earl Peter Toole, testified that the $44,000 he received from Michael was a repayment on a loan. However, there was also testimony concerning earlier transfers from the elder Tooles to Michael and Patricia in 1972, and the evidence further indicated that Michael and Patricia signed promissory notes in 1974, at a time when the elder Mr. Toole needed evidence to improve his personal financial statements in connection with the construction business he owned. The money supposedly represented by the notes actually dated back to the construction of Michael's and

Patricia's original home in 1971. The elder Mr. Toole acknowledged that his daughter had also been given a similar amount of money under similar circumstances and that she and her husband had also subsequently been asked to sign notes. Michael's father failed to request repayment from Michael or Patricia for this alleged debt prior to the commencement of divorce proceedings by Patricia, and furthermore his daughter and son-in-law had never repaid the "notes" into which they supposedly entered. Moreover, Michael had certified that no monies placed as earnest money on the purchase of the property for the house had been borrowed. In light of the evidence, the trial court did not err in requiring Michael to repay the $44,000 into the marital estate for division.

■ Next, Michael argues that the trial court erred by ordering Michael to reimburse the marital estate for $27,883 for a tax obligation. We disagree. Michael's father testified that he gave his interest in Potteiger Corporation to Michael and Michael's sister. Michael testified that, when Potteiger was dissolved, assets in excess of $400,000 were distributed to the two shareholders—Michael and his sister. The distribution was subsequently recalculated, resulting in an additional distribution to the shareholders and a concomitant additional tax liability in the amount of $27,883. This additional tax liability, incurred by the virtue of Michael's *nonmarital* Potteiger stock, was paid by Michael and Patricia. Just as a party is entitled to retain nonmarital assets, a party is also subject to liability, absent special circumstances, for debts incurred on account of those assets. (750 ILCS 5/503(d) (West 1992); *In re Marriage of Lees* (1992), 224 Ill. App. 3d 691, 694.) Thus, the trial court did not err when it ordered Michael to repay the $27,883 into the marital estate.

### III. CHILD SUPPORT

The record reveals that, after the separation, Michael paid an amount below the statutorily required minimum (see 750 ILCS 5/505 (West 1992)) to Patricia for child support. Patricia filed a petition for more child support in November 1991, but the petition was not heard until the time of trial.

■ The trial court ordered Michael to pay retroactive child support in the amount of $21,643.32 to equal the statutorily required minimum amount. (See 750 ILCS 5/505, 510(a) (West 1992).) On appeal, our inquiry is limited to whether the trial court abused its discretion in awarding this amount as retroactive child support. (*In re Marriage of Carpel* (1992), 232 Ill. App. 3d 806, 815.) An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. *In re Marriage of Partney* (1991), 212 Ill. App. 3d 586, 590.

Although Patricia's petition for child support was filed in November 1991 but not heard until the time of trial, Michael acquiesced in this procedure, and the record does not disclose that he suffered prejudice because of the delay.

The trial court did not abuse its discretion in ordering Michael to pay retroactive child support. Michael should not be allowed to benefit from his children reaching the age of majority because of the delay in the child support proceedings. Furthermore, after the separation, his children lived with Patricia, and Michael made payments substantially below the statutory minimum of 25% for two children. (750 ILCS 5/505(a)(1) (West 1992).) The record also reveals that Michael utilized bookkeeping procedures and other excuses to reduce or delay the minimal payments that he was making. In light of the record, then, we find no abuse of discretion with regard to child support.

## IV. EVIDENTIARY RULINGS

Michael contends the trial court erred by not admitting into evidence a statement made by Patricia in a settlement offer and by admitting into evidence a letter from Patricia's doctor.

We agree with Michael that the statement in the settlement offer contradicts a material point of Patricia's testimony regarding whether the $44,000 from Michael's parents was a gift or a loan and, therefore, should have been admitted into evidence for impeachment purposes. (*Sawicki v. Kim* (1983), 112 Ill. App. 3d 641, 644.) However, in light of the other evidence and testimony regarding the nature of the $44,000 payment from the elder Tooles to Michael and Patricia, we are not convinced that, had Patricia's statement in the settlement offer been allowed into evidence, the trial court would have changed its decision. Therefore, we find this error harmless. *J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.* (1985), 108 Ill. 2d 106, 115.

Michael also contends that a letter from Patricia's doctor was erroneously admitted. We agree with Michael that its admission was error, but determine that the evidence was merely cumulative and is, therefore, harmless. *Pharr v. Chicago Transit Authority* (1991), 220 Ill. App. 3d 509, 517.

Patricia also contends that the trial court erred by not ordering her attorney fees paid by Michael. However, there was never a petition before the trial court that Patricia be awarded attorney fees, and Patricia has thus waived this issue. *In re Marriage of Pagano* (1989), 181 Ill. App. 3d 547, 555.

The judgment of the circuit court of Du Page County is affirmed in part and reversed in part. Because of our determination on the

maintenance award, we are compelled to remand this cause to the trial court to determine if its ruling related to the property division, which we have otherwise determined not to constitute an abuse of discretion in its current form, should be revisited. See 750 ILCS 5/503(d)(12) (West 1992); see also *Klein*, 231 Ill. App. 3d 901.

Affirmed in part; reversed in part and remanded.

INGLIS, J., concurs.

JUSTICE RATHJE, dissenting:

I respectfully dissent regarding the majority's reversal of the trial court's award of rehabilitative maintenance. I concur with the majority's treatment of all other issues.

In *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.* (1994), 158 Ill. 2d 76, our supreme court wrote:

> "[T]here is no rule of [statutory] construction which authorizes a court to declare that the legislature did not mean what the plain language of the statute imports. [Citation.] Where an enactment is clear and unambiguous *** a court is not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express." *Solich*, 158 Ill. 2d at 83.

The statute reads in relevant part:

> "[T]he obligation to pay *future maintenance* is *terminated* *** if the party receiving maintenance *cohabits* with another person on a *resident, continuing* conjugal basis." (Emphasis added.) 750 ILCS 5/510(c) (West 1992).

Initially, I disagree with the majority's conclusion that section 510(c) applies to this case. Section 510 explicitly states that it deals with "*Modification and termination* of provisions for maintenance, support, educational expenses, and property distribution." (Emphasis added.) (750 ILCS 5/510 (West 1992).) Prior to the subject judgment, petitioner had received no maintenance which could have been modified or terminated.

Assuming, *arguendo*, that section 510(c) is applicable to the facts of this case, it is clear that the plain meaning of the statutory language in this section does not bar an award of maintenance to this petitioner. The evidence demonstrates that, during the course of the proceedings, petitioner had stopped cohabiting with David Hughes. Petitioner testified that she had executed a lease for rental of a mobile home in Bullhead City, Arizona, which was 25 miles away from Hughes' residence. She further testified that she had

prepaid utilities for her new residence and completed her move during the trial. This evidence supported the trial court's conclusion that, after May 15, 1994, petitioner was no longer cohabiting with Hughes.

The statute says nothing about past cohabitation; it only speaks to continuing cohabitation, which is not at issue here. Thus, it cannot be read as barring rehabilitative maintenance where, as here, the subject cohabitation had ended.

Based upon this record, the trial court clearly did not abuse its discretion in awarding rehabilitative maintenance to petitioner.

Moreover, I do not find the majority's reliance on *In re Marriage of Klein* (1992), 231 Ill. App. 901, at all persuasive. Initially, I note that *Klein* is factually distinguishable from the appeal at bar. In *Klein*, the petitioner was clearly cohabiting throughout the proceedings and did not indicate any intention of ending that relationship. The *Klein* petitioner was obviously not entitled to maintenance.

Additionally, I do not agree with the reasoning the *Klein* court employs in finding that maintenance can be denied to a party who cohabits before maintenance is awarded. The majority cites the following passage from *Klein*:

"There should be no distinction between whether petitioner's obligation is terminated before it ripens or after maintenance is ordered. *If a party died before maintenance was awarded, or if a party remarried before the award, there would be no reason for awarding maintenance only to then require it to be terminated pursuant to section 510(c). Similarly, if a party who seeks maintenance cohabits before maintenance is awarded, the award should be denied pursuant to section 510(c).* [Citation.]" (Emphasis added.) (*Klein*, 231 Ill. App. 3d at 905.)

To justify its erroneous conclusion that there should be no distinction between whether a party's obligation is terminated before it ripens or after maintenance is ordered, the *Klein* court attempts to analogize cohabitation to death and remarriage. To state the obvious, death is a permanent condition, and, hopefully, so is remarriage. Conversely, cohabitation is, in the vast majority of cases, a temporary circumstance. Thus, the analogy does not work. As the case at bar demonstrated, cohabitation can indeed end prior to the award of maintenance.

Further, the *Klein* court stated:

"Although case law cited by petitioner addresses termination of maintenance when the recipient is found to be cohabiting, cohab-

iting should not be ignored in determining the propriety of an original maintenance award. To espouse such a view ignores the potential for unnecessary, continuing strains between the parties whose marriage has ended. *Although respondent's counsel conceded respondent was cohabiting, if this action disqualifies her for maintenance only if she continues cohabiting, petitioner would be forced to continue to monitor respondent's activities to learn if this status changed. Such contacts between the parties should not be encouraged.*" (Emphasis added.) *Klein*, 231 Ill. App. 3d at 905.

In response to this passage, I would first note that divorce cases routinely involve follow-up monitoring. More importantly, the demonstrated need of a party, such as the instant petitioner, for rehabilitative maintenance should certainly take precedence over the burden of monitoring, if any, placed upon the other party.

I would affirm the trial court's award of rehabilitative maintenance.